Michael Dennis QUINN, Appellant,

v.

The STATE of Texas.

No. 1691–96.

Court of Criminal Appeals of Texas, En Banc.

Dec. 3, 1997.

Gary A. Udashen, Dallas, for appellant.

Matthew Paul, State's Atty., Austin, for State.

*OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW*

KELLER, Judge, delivered the opinion of the Court in which McCORMICK, Presiding Judge, and BAIRD, MANSFIELD, PRICE, HOLLAND and WOMACK, Judges, joined.

Appellant was convicted of aggravated sexual assault of a child and indecency with a child. On appeal he contended, among other things, that (1) he should have been granted

a new trial because a juror discussed his case with a person outside of the trial and (2) he should have been granted a new trial because that juror was biased. The Court of Appeals reversed the conviction on claim (1) on original submission. After the State filed a petition for discretionary review, the Court of Appeals issued a second opinion, which justified reversal of the conviction on claim (2). We will reverse the judgment of the Court of Appeals.

### 1. Facts

After the State had rested, but before the defense put on evidence during the guilt-innocence stage of the trial, a co-worker paged juror Thomas to determine if the juror could work any overtime. During the phone call, the following exchange took place:

[Co-worker]: You can't get there.

[Thomas]: uh, uh, (no), I got off early [today], last night we went to 7:00 p.m.

[Co-worker]: You are kidding.

[Thomas]: No, it is a nasty mess.

[Co-worker]: What kind of deal is it?

[Thomas]: Hold on just a second. (Caught another line).

[Thomas]: OK, Its a rape of a 5 year old, is that fun or what?

[Co-worker]: I don't envy you.

. . . .

[Thomas]: ... Hell we stay in the Jury Room all of the time, I never did that before and don't care to do that again. That is the only case that ... If in fact the guy is guilty, then can you send a bastard like that to the pen to play drop the soap with the Butt Brothers?

[Co-worker]: Yea.

[Thomas]: You know because you can't kill them and the most you can give them is life or 99 years and that means they are out in 10.

[Co-worker]: Yea or sooner if they get too crowded.

[Thomas]: Yea, but, like I say, he needs to play drop the soap with the Butt Brothers,

some of them boys that were rejects from the Houston Oilers.

[Co-worker]: Yea.

[Thomas]: I guess I will pass for the time being till that mess is kind over or drops down or something.

*See Quinn v. State*, No. 2–95–275–CR, slip op. at 2 (Tex.App.—Fort Worth, July 18, 1996)(unpublished).[1] Appellant filed a motion for new trial and alleged, among other things, that this conversation was an improper communication with an outside person about the case and that the communication showed bias rendering Thomas unfit as a juror and denying appellant a fair trial.[2]

At a hearing on the motion for new trial Juror Thomas testified concerning this conversation. He repeatedly denied that the conversation had any effect on his deliberations, he maintained that he waited until he heard all the evidence before forming opinions as to guilt and punishment, and he denied repeating his conversation with the co-worker to any of the other jurors. This testimony included the following:

[Defense counsel]: And Mr. Thomas, did you say to Mr. Wilder, you know, because you can't kill them, the most you can give them is life or 20 years? Is that the way you felt when you had this conversation with Mr. Wilder on May 17th?

[Thomas]: No, because all the evidence, we hadn't even heard the Defense at that point.

. . . .

[Defense counsel]: It's your testimony that you hadn't formulated any decision on this case until all the evidence was in; is that correct?

[Thomas]: That's correct.

. . . .

[Prosecutor]: Were you objective in this case?

[Thomas]: Yes, ma'am.

[Prosecutor]: Were you open-minded in this case?

[Thomas]: Yes ma'am.

---

**1.** The conversation was tape-recorded by the branch of the fire department at which Thomas worked.

**2.** The latter claim was made in a supplement to the motion for new trial.

[Prosecutor]: Did you listen to all of the evidence and then decide the verdicts in each phase of the trial?

[Thomas]: Repeat that, please. I'm sorry.

[Prosecutor]: In other words, before reaching your verdict in each phase of the trial, did you wait until you heard all of the evidence and the Court read you the charge and you had listened to our arguments before you reached a decision?

[Thomas]: That's correct.

[Prosecutor]: Did you foreclose probation in this case?

[Thomas]: No. I mean, not till everything was in.

[Prosecutor]: Not till you had heard all of the evidence—

[Thomas]: Right.

[Prosecutor]:—by both the State and the Defense—

[Thomas]: Correct.

[Prosecutor]:—in the punishment phase? And then based on the facts, you didn't feel that was an appropriate punishment.

[Thomas]: No. [Prosecutor]: Okay, but you did not begin discussing it until after the Court had admonished the jury and charged them and we had both given arguments and you returned to the jury room; is that correct?

[Thomas]: Correct. On Monday.

. . . .

[Prosecutor]: And as you sit here under oath, having made the statements about what child molesters do in prison and what occurs to them in prison, can you tell this Court under oath that you did not foreclose probation?

[Thomas]: That's correct.

[Prosecutor]: So you still could consider the full range of punishment throughout the trial until you heard all of the evidence?

[Thomas]: That's correct.

. . . .

[Prosecutor]: Did you ever make any comment to other members of the jury that you had talked about this case with anyone else.

[Thomas]: No.

[Prosecutor]: Did you ever make any comment in the jury room that, well, my friend thinks that they also ought to go to the penitentiary?

[Thomas]: No.

[Prosecutor]: Did you make any comment in the jury room that, well, my friend agrees with me, any friend or any other person, agrees with me that they ought to go to the penitentiary and play the butt game or kick the soap game?

[Thomas]: No.

[Prosecutor]: And was there any statement on the part of [the co-worker] that influenced your beliefs regarding this Defendant?

[Thomas]: No.

[Prosecutor]: Was there any statement that he made that affected your decision, either in guilt-innocence or punishment, regarding this Defendant?

[Thomas]: No.

. . . .

[Prosecutor]: And Mr. Thomas, you did not bring any outside comments or evidence into that jury room with you, did you?

[Thomas]: No.

[Prosecutor]: And your decision was based on only the evidence that you heard in this courtroom; is that correct?

[Thomas]: That's correct.

[Prosecutor]: In both phases of trial?

[Thomas]: That's correct.

. . . .

[Defense counsel]: When you use the words, sir, "he needs to," does not that indicate that you formulated an opinion?

[Thomas]: That's correct. I had not formulated an opinion.

[Defense counsel]: You had not or had?

[Thomas]: Had not.

[Defense counsel]: The word, "he needs to," says he had not, in your opinion? You hadn't formed an opinion?

[Thomas]: I believe when I made that statement, I prefaced it with "if he is guilty."

[Defense counsel]: That was made a little earlier, sir. "Yeah, or sooner if they get too crowded," and you respond what we've asked: "Yeah, but like I say, he needs to play drop the soap with the Butt brothers. Some of them boys have been rejects from the Houston Oilers"?

[Thomas]: All that was based on the fact that in my opinion, I had not received the information from the trial to decide if the Defendant was guilty or not.

. . . .

[Court]: Did you afford this Defendant, Mr. Michael Quinn, the presumption of innocence?

[Thomas]: Oh, yes, sir.

[Court]: Did you fully and fairly listen to all his testimony presented in his defense with an open mind?

[Thomas]: Yes, sir.

[Court]: Did you listen to all the other information and evidence presented by counsel for the Defense and other witnesses on Mr. Quinn's behalf with an open mind?

[Thomas]: Yes, sir.

[Court]: I take it you listened to the State's information with an open mind?

[Thomas]: Listened to all information.

[Court]: Did you make a decision on what the verdict should be prior to going back in the jury room when you were sent back there by the Judge with the other jurors with the Court's charge with he instruction to reach a verdict and select a Presiding Juror? Did you make a decision in this case before you were sent back there with those instructions?

[Thomas]: No.

[Court]: You indicated that prior to assessing punishment, hearing the rest of the testimony, you had an open mind to probation; is that correct?

[Thomas]: Yes, sir.

. . . .

[Defense counsel]: It's your testimony then, Mr. Thomas, that after what the Court's asked you, that you had an open mind and did not have your mind made up on this matter, even after your conversation with [the co-worker] May the 17th about 6:42 p.m.?

[Thomas]: I had made no decision on the case at that time.

. . . .

[Court]: Is there anything about the conversation you had with [the co-worker] on May the 17th of 1995 which had any influence or impact, however slight, on your deliberations as a juror in this case?

[Thomas]: No, sir. None.

(Bracketed material substituted for original; ellipses inserted).

After Thomas' testimony, the State called the other eleven jurors. Every juror denied hearing Thomas make any reference to a conversation with a person outside the jury. The parties asked the jurors about various terms found in Thomas' conversation with his co-worker, including "drop the soap," "Butt Brothers," and "Houston Oilers" references. Every juror was not asked about every term, but with two exceptions, whenever questioned about such terms, the jurors testified that they had not heard the terms in question. Two jurors recalled the term "drop the soap." One juror could not be sure that anyone on the jury had used that term; the other juror, who was the presiding juror, remembered the term being mentioned in the jury room. Neither juror could recall whether Thomas used that term although the presiding juror said that Thomas might have. The presiding juror stated that the "drop the soap" comment had no effect on his decision and played no role in the jury deliberations. The other juror stated that Thomas said nothing that influenced the juror's verdict, and that the juror based his decision solely upon the evidence.

The trial court denied appellant's motion for new trial and made the following relevant findings of fact and conclusions of law:

1. On May 17, 1995, Juror Philip Thomas communicated by telephone with [a co-worker], and during this conversation, Juror Thomas disclosed information about the case on trial concerning the age of the alleged victim, the allegations, and matters observed during voir dire;

2. The conversation of May 17, 1995, involving Juror Philip Thomas was in violation of the Court's prior instructions to the jury;

3. The conversation and information discussed during said conversation of May 17, 1995, was not related by Juror Philip Thomas to any other jurors in the case.

4. The unauthorized conversation of Juror Philip Thomas on May 17, 1995 did not enter into nor affect the deliberations of the jury on the issues of guilt/innocence or punishment;

. . . .

6. Although harm may and should be presumed in the event of unauthorized communications, testimony from all twelve jurors clearly demonstrated that the May 17, 1995 telephone conversation of Juror Philip Thomas was not discussed by jurors individually or collectively and played no role in the jury's fact finding or deliberating processes.

7. The Defendant was not harmed by the unauthorized communication, received a fair trial by an impartial jury, and received effective assistance of counsel during jury selection.

(Bracketed material substituted for original; ellipses inserted).

### 2. Court of Appeals' opinions

In its opinion on original submission, the Court of Appeals held that the conversation between Thomas and his co-worker may have influenced Thomas to more readily convict and assess a harsher punishment:

In this case, we are concerned with two presumptive injuries that Quinn may have suffered. The co-worker's statement that he did not envy the juror, as well as his agreement with the juror's proposals to send Quinn to prison for sexual torture, may have worked to place extra pressure on the juror to convict Quinn so as not to face ridicule once he returned to work. These statements could also have worked to bolster the weight that the juror gave to evidence presented by the State, as well as working against the evidence yet to be produced by Quinn. Moreover, the co-worker's approval of the harsh punishment

suggested by the juror, especially when coupled with the co-worker's comments concerning early prison release because of crowded prison conditions, could have had the effect of persuading [Thomas] to increase the punishment he was likely to assess.

*Quinn,* slip op. at 3 (on original submission)(bracketed material substituted for original). The Court of Appeals further found "some evidence," in the progression of the conversation, that the conversation influenced Thomas' thoughts:

The juror started out the conversation by stating "If in fact the guy is guilty . . . ," yet by the end of the conversation, he has removed the equivocation from his statements—"Yea, but like I say, *he needs* to play drop the soap . . . ."

*Id.* at 3–4 (Ellipses and emphasis in original).

Moreover, while the Court of Appeals acknowledged that Thomas testified that he did not repeat any outside information to the other jurors, the court held that "some evidence casts this assertion into doubt." *Id.* at 6. This "some evidence" consisted of the testimony by two jurors who recalled the "drop the soap" expression. *Id.* at 6–7.

The Court of Appeals acknowledged in the abstract that an issue of juror misconduct should be reviewed using an abuse of discretion standard. Nevertheless, the court held that a new trial was required because Thomas initiated the misconduct, because he continued the impermissible conversation beyond the point of an inadvertent slip, and because there was evidence that Thomas "may have contaminated other jurors with the offending conduct." *Id.* at 7. The Court of Appeals then concluded that allowing any other result "would only condone juror misconduct and serve to encourage it in the future." *Id.* at 7–8.

Although it acknowledged that the presumption of injury from jury misconduct is rebuttable, *Id.* at 4, the Court of Appeals did not address Thomas' testimony that the conversation did not influence him regarding the case and that he kept an open mind about guilt and punishment until after all of the evidence was elicited for those respective

issues. Moreover, while the Court of Appeals held that evidence cast doubt on Thomas' testimony that he did not communicate the outside conversation to the other jurors, the court did not explain why Thomas' testimony must be disbelieved. The court also did not discuss the other jurors' testimony that Thomas conveyed no outside conversations, and the Court of Appeals did not address the trial court's findings of fact and conclusions of law.

The State filed a petition for discretionary review with this Court. In that petition, the State contended, among other things, that the Court of Appeals improperly usurped the trial court's function of determining the credibility of the witnesses. In response to the State's petition, the Court of Appeals issued a second opinion, which refused to withdraw the first opinion. *Quinn v. State*, No. 2–95–275–CR, slip op. at 5 (Tex.App.—Fort Worth, November 7, 1996)(opinion on reconsideration of State's Petition for Discretionary Review)(unpublished). In its second opinion, the Court of Appeals stated that its first opinion did not conduct a *de novo* determination of the credibility of the witnesses. *Id.* at 1. The court further stated that: "Although the opinion reviews that testimony with skepticism, it makes no ruling on the credibility of their testimony." *Id.* at 1–2.

The Court of Appeals then stated that the real issue was whether the juror had committed "misconduct as a matter of law." *Id.* at 2. The court found the misconduct as a matter of law to be Juror Thomas' expression of bias against the defendant. *Id.* The Court of Appeals found that Thomas had decided that the defendant was guilty and was already speculating about the indignities the defendant would suffer in prison. *Id.* Citing Texas Code of Criminal Procedure, Article 35.16(a)(9), the court noted that a juror who is shown at voir dire to be biased against a defendant may be challenged for cause. *Quinn,* slip op. at 2 (second opinion). The court then argued that fairness requires the same analysis to apply after the juror is seated on the jury. *Id.* at 3. The court further held that all the testimony at the motion for new trial hearing was irrelevant because Thomas' telephone conversation

showed bias as a matter of law, and hence, no "rehabilitation" was possible. *Id.* at 4. According to the Court of Appeals, the effect of Thomas' bias was that the State only had to persuade eleven jurors, instead of twelve, of the defendant's guilt.

The State amended its petition to respond to the Court of Appeals' second opinion, and we granted review. We now address the issues presented.

### 3. Unauthorized conversation

 When a juror converses with an unauthorized person about the case, "injury to the accused is presumed" and a new trial may be warranted. *Robinson v. State,* 851 S.W.2d 216, 230 (Tex.Crim.App.1991), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994). *See also* Tex.Code Crim. Proc., Art. 36.22; former Tex.R.App. P. 30(b)(7)(1996)(now Tex.R.App. P. 21.3(f)). However, the State may rebut this presumption of harm. *Robinson,* 851 S.W.2d at 230; *Thomas v. State,* 699 S.W.2d 845, 853–854 (Tex.Crim.App.1985). *See also Moody v. State,* 827 S.W.2d 875, 899–900 (Tex.Crim. App.1992), *cert. denied,* 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). In determining whether the State rebutted the presumption of harm, appellate courts should defer to the trial court's resolution of the historical facts and its determinations concerning credibility and demeanor. We have recently stated that:

> as a general rule, the appellate courts, including this Court, should afford almost total deference to a trial court's determination of historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. [Citation omitted]. The appellate courts, including this Court, should afford the same amount of deference to trial courts' rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns upon an evaluation of credibility and demeanor.

*Guzman v. State,* 955 S.W.2d 85 (Tex.Crim. App.1997). We have made similar statements with regard to factual issues in previ-

ous cases dealing with jury misconduct. *Moody*, 827 S.W.2d at 899; *Thomas*, 699 S.W.2d at 854. In giving "almost total deference" to the trial court's resolution of issues turning upon an evaluation of credibility and demeanor, we in essence view the evidence in the light most favorable to the trial courts findings (or ruling, if there are no pertinent findings). *See Cantu v. State*, 930 S.W.2d 594, 596 (Tex.Crim.App.1996). *See also Villarreal*, 935 S.W.2d 134, 150 (Tex.Crim.App.1996)(Keller, J. concurring).

■ In the present case, the Court of Appeals failed to give the proper deference to the trial court's resolution of the historical facts and to its determinations of credibility and demeanor. The trial court found that Thomas did not communicate the conversation with his co-worker to any of the other members of the jury, and the trial court found that the conversation did not affect the jury's deliberations. The record contained plenty of evidence supporting those findings. Juror Thomas testified that he was not in any way influenced by the conversation with his co-worker and that he did not convey any of that conversation to the other members of the jury. The other eleven jurors also testified that Thomas did not convey such a conversation. The trial court was free to believe this testimony. In prior cases, we have held that testimony from the juror involved in the impermissible conversation is enough evidence to support a trial court's ruling that the State sufficiently rebutted the presumption of injury. *Robinson*, 851 S.W.2d at 230 (juror who received prejudicial information from sister testified that the statement would not influence her in reaching a verdict and that she had not communicated such information to the other jurors); *Thomas*, 699 S.W.2d at 853–854 (juror who overheard conversation between third parties relating to the case testified that the conversation did not influence him at all in reaching a verdict or deciding punishment and that he did not tell anyone else about the statement). The Court of Appeals erred in viewing the testimony with "skepticism" and in disregarding testimony supporting the verdict because other testimony "cast doubt" on its truthfulness. Resolving questions of credibility is the province of the trial court. Viewed in the

light most favorable to its findings, we find that the evidence supports the trial court's decision to deny appellant's motion for new trial on the ground of improper juror communications.

### 4. Bias

■ Juror "bias" is not expressly listed as a reason for granting a motion for new trial. We have, however, indicated that bias can constitute "such misconduct that the accused has not received a fair and impartial trial." *See Norman v. State*, 588 S.W.2d 340, 347 (Tex.Crim.App.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980)(citing former Tex.Code Crim. Proc., Art. 40.03(8), predecessor to former Tex. R.App. P. 30(b)(8), predecessor to current Tex.R.App. P. 21.3(g); quoted text from former Rule 30(b)(8)). And, caselaw construing bias shown through voir dire questioning may be helpful in analyzing biases expressed in other contexts. But such caselaw is not necessarily controlling, because juror biases expressed outside the voir dire context may implicate different concerns.

When a prospective juror is questioned during voir dire, the trial court impresses upon him the importance of truthfully answering the questions posed. *See* Tex.Code Crim. Proc., Art. 35.02. But the same is not necessarily true outside of the courtroom. In a non-courtroom context, a person may feel free to joke, embellish, or even lie outright about any number of subjects, including those related to jury service. Moreover, everyday language is often imprecise, in contrast to voir dire questioning in which attorneys attempt to procure precise answers to their questions. Hence, an unequivocal statement 'of bias during voir dire is not necessarily unequivocal outside that context.

■ Other differences surface after the trial progresses. That jurors may formulate opinions during trial on the basis of the evidence presented is a natural, and desirable, consequence. In many respects, such a situation is similar to allegations of judicial bias arising from the same proceedings. Ordinarily, a judge may not be disqualified due to "bias" unless the bias stems from an "ex-

trajudicial" source. *Kemp v. State,* 846 S.W.2d 289, 305–306 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). That is because "bias" is considered an inclination toward one side that leads to a natural inference that the decision-maker is not impartial. *Anderson v. State,* 633 S.W.2d 851, 853 (Tex.Crim.App. 1982). But, opinions based upon evidence received in judicial proceedings do not ordinarily raise questions about impartiality: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky v. United States,* 510 U.S. 540, 551, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474, 488 (1994). Of course, a juror must keep an open mind as to the ultimate question before him (i.e. guilt or punishment) until all of the evidence has been received. But, it defies common sense and human nature to require that a juror have no impressions or opinions until the judge sends the jury to deliberations. Jurors must necessarily engage in at least some assessment of credibility and evaluation of the evidence as the proceedings occur.

■ With these considerations in mind, we turn to the issue at hand. Relying upon *Anderson* and *Green v. State,* 840 S.W.2d 394, 404–405 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993) and analogizing to challenges for cause, the Court of Appeals held that, given the expression of his alleged bias during the telephone conversation, Thomas could not be "rehabilitated" at the motion for new trial hearing. But, *Anderson* and *Green* did not foreclose rehabilitation of a prospective juror after making statements appearing to show bias. Those cases merely held that a challenge for cause must be granted against a prospective juror who admits bias but states that the bias can be set aside; the trial court still retains discretion to determine whether the prospective juror was biased in the first place. *Anderson,* 633 S.W.2d at 854. *See also Green,* 840 S.W.2d at 404–405. There is a statutory basis for granting a challenge for cause without permitting rehabilitation in certain situations. *See* Tex.Code Crim. Proc., Art. 35.16(a)(10). But, obvious-

ly, that provision applies only to voir dire proceedings. Given the above-discussed differences between voir dire and out-of-court conversation environments, and the differences between opinions formed before and after hearing evidence, we find extension of the 35.16(a)(10) standards to the present circumstances to be inappropriate. Given the uncertainties surrounding the reliability and precision of out-of-court statements, such statements made by a juror after hearing evidence should never automatically establish bias. Instead, an inquiry is appropriate to determine the juror's intent when making the statement. Hence, the evidence presented at the motion for new trial hearing was properly before the trial court for consideration.

■ As discussed earlier, at the motion for new trial hearing, Thomas testified that he kept an open mind, and made no decision, as to guilt and to punishment until all of the evidence was received on those respective issues. He further testified that he kept an open mind concerning the potential assessment of probation until he received all of the evidence. Viewing the evidence in the light most favorable to the trial court's finding that appellant received a fair trial by an impartial jury, we find that the evidence was sufficient to deny appellant's motion for new trial on the ground of bias.

We reverse the judgment of the Court of Appeals and remand this cause for consideration of appellant's remaining points of error.

BAIRD, J., joins the opinion but dissents to the decision to publish believing the opinion adds nothing to the jurisprudence of the State.

OVERSTREET, J., concurs in the result.

MEYERS, J., joins parts 1, 2, and 3, and concurs in part 4.