# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00060-CR

**Kathryn Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 00-3827, HONORABLE JULIE KOCUREK, JUDGE PRESIDING

Appellant Kathryn Williams pleaded not guilty to charges of burglary of a habitation with intent to commit aggravated assault. *See* Tex. Pen. Code Ann. § 30.02(a)(1) (West Supp. 2001). After waiving a jury trial, the district court found appellant guilty of the offense, determined that she used a deadly weapon, and assessed punishment at twenty years in prison. Appellant raises six issues contending (1) that the district court erred in finding the knife she used was a deadly weapon and (2) that she received ineffective assistance of counsel during the plea-bargain process and during the punishment phase of trial. We will affirm the district court's judgment.

### Background

Betsy Heaston, a case manager with Travis County Mental Health and Mental Retardation, testified that on May 3, 2000, she went to appellant's house for her regular weekly visit. Appellant had been diagnosed with a multiple personality disorder and Heaston visited her once a

week to assist her with life skills. Heaston had been working with appellant for three or four years. Heaston arrived at appellant's house, noticed appellant's keys in the lock of her front door, and found appellant asleep in her closet. She called to appellant a few times but when appellant did not awaken Heaston put appellant's keys where she would find them easily when she awoke and left a note saying she stopped by.

Heaston went home for lunch, and about 12:30 she heard someone pounding on her back door which she keeps closed and locked. She unlocked and opened the door at which point appellant immediately lunged inside and jumped on her. Appellant, who did not have Heaston's consent to enter the house, had forced open the locked screen door. Appellant grabbed Heaston around the neck with her left arm and yelled, "You f-----g b----h. You f-----g left the babies in the closet." Heaston immediately realized that appellant held in her right hand a knife with a missing handle. The knife was admitted into evidence. With her left arm around Heaston's neck and the knife in her right hand, appellant forced Heaston into the dining room as she continued to yell at Heaston about leaving the babies in the closet. Eventually, appellant allowed Heaston to sit down while she paced back and forth in the dining room holding the knife. Heaston knew enough about appellant's mental condition to know that she referred to her multiple personalities as babies. Heaston asked appellant if she could speak with either the Kathryn or the Amy personality. Appellant responded that Heaston had locked them in the closet and they could not get out. Heaston then asked appellant, who was still in an angry state, what she wanted, to which appellant responded, "I want to get out. I can't stand being in here with all of them." Appellant then walked into the living room and Heaston called 911. She, however, did not have a chance to speak with a 911 operator due to continuing events.

2

At this point, Heaston's son stopped by for a visit and as he walked into the house Heaston called out to him to call the police. At this point, appellant again grabbed Heaston around the neck with her right arm, this time holding the knife in her right hand very close to Heaston's neck with the blade toward her throat. Heaston was fearful that the knife could cause her serious bodily injury or death. Heaston's son saw appellant holding the knife against his mother's throat and he backed out of the house and immediately ran to a neighbor's house to call police. Heaston's son testified that he was fearful appellant would use the knife to seriously harm his mother. Appellant told Heaston that she wanted to leave the house and told Heaston to get her keys. Heaston got her keys off of the mantle and appellant forced her outside continuing to restrain Heaston by holding her with her right arm around her neck and holding the knife in her right hand against Heaston's throat. When they got to the car, appellant changed her mind and forced Heaston back inside the house.

Appellant maneuvered Heaston into the dining room and let go of her neck. Heaston moved to one end of the table. Appellant squatted down and began rocking, tapping her head against the table. Heaston again asked to speak to the Amy personality and this time appellant responded. Appellant agreed to give up the knife and she laid it on the table. Heaston hid the knife under some papers on the table. Appellant produced another knife she had in her pocket and she also put it on the table. Appellant again became angry and, as she walked into the kitchen, Heaston fled from the house. Heaston went across the street and called 911. A neighbor noticed appellant walking down the street with a kitchen knife in her hand. Finally, appellant got into a car and drove away. Heaston and her son returned home and realized that a knife had been taken from the kitchen.

3

Soon, police officers arrived and recovered the two knives on the dining room table. They also noted fresh marks on the back door where appellant entered Heaston's house. Officer Canizales testified at trial that based on his training and experience the knife appellant used to threaten Heaston was capable of inflicting serious bodily injury.

Margaret Williams, appellant's psychotherapist, also testified at trial.[1] Williams explained appellant's mental conditions as a dissociative disorder with multiple personality disorder, a bipolar disorder, and a borderline personality disorder. Williams returned to her office around 1:00 in the afternoon to find appellant waiting for her. Appellant was curled up in a fetal position behind a couch distressed and crying. Appellant told Williams she was worried about Heaston and demanded that Williams call Heaston. Williams called Heaston's home and a police officer answered the phone. He told Williams that she could talk to Heaston later. Williams attempted to comfort appellant but appellant became very angry. Appellant then quickly changed her mood and became very child-like, picked up a teddy bear and sat down in a chair. The police arrived soon afterward and arrested appellant.

Appellant testified at trial and confirmed Heaston's version of the events. The court found appellant guilty of burglary with intent to commit aggravated assault.

During the punishment phase of trial, Susan Roller, an art therapist, testified that appellant was one of her patients during 1989 and 1990. Roller ended her relationship with appellant in July 1990 after appellant threatened her with a knife following a therapy session. During that incident, appellant brandished a knife, handed Roller a note and demanded that Roller accompany her.

---

[1] Williams is not related to appellant.

4

Roller stalled for time, afraid to leave with appellant. Finally, the telephone rang and Roller told appellant the person on the other end of the phone was going to call the police. Appellant ran out of Roller's office.

In July 1992, Roller agreed to work with appellant when she was hospitalized at Shoal Creek Psychiatric Hospital. While Roller was in a hospital hallway appellant approached her and suddenly lunged at her. Over the next several years, on various occasions when Roller was out walking her dog near her home she would notice appellant close by, apparently watching her. In 1999, appellant called and left a disturbing message on Roller's answering machine. Roller testified that she felt appellant was a continuing threat to her safety.

Guadalupe Hernandez worked security at the highrise building where Roller lived. She testified that on April 3 or 4, 1999, appellant came into the lobby stating that she had a singing telegram for Roller. Hernandez called upstairs to Roller and Roller told her to ask appellant to leave. After arguing with Hernandez, appellant left the building and stood across the street. She phoned the building again wanting to see Roller and stating that her car had broken down. Hernandez recognized appellant's voice and told her she could not come into the building.

Heaston also testified at the punishment phase of trial. She explained how the incident with appellant had changed the way she lives her life. She testified that she is working to get over her fear. She testified that unless appellant were in prison she would not feel safe in her own home.

Williams also testified at the punishment hearing that appellant had worked with Margaret Santiago from the Alameda House for about ten years. Appellant visited Santiago's house

several times uninvited. On one occasion when appellant showed up at Santiago's house without an invitation, Santiago called the police and, because appellant was delusional, they took her to the hospital. On another occasion, after Santiago had moved out of Austin, appellant was found in the back yard of Santiago's former house barking like a dog and attempting to hang herself from a tree.

Appellant also testified at the punishment hearing and told the court that she could not hurt anyone. The court sentenced appellant to twenty years in prison.

At the hearing on appellant's motion for new trial, appellant's new attorney raised ineffective assistance of counsel issues which are also the subject of this appeal. Appellant, Heaston, appellant's trial attorney and the prosecuting attorney all testified at the hearing. The district court overruled the motion for new trial.

**Discussion**

Appellant contends that the evidence is legally and factually insufficient to support the court's finding that the knife appellant held against Heaston's throat was a deadly weapon. Appellant also contends that the trial court erred in overruling her motion for new trial because testimony relating to her threat to Susan Roller admitted during the punishment phase was obtained illegally and, therefore, its admission violated Texas Code of Criminal Procedure article 38.23. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West Supp. 2001). Additionally, appellant contends that she received ineffective assistance of counsel because her attorney failed to object to the admission of the illegally obtained evidence. Finally, appellant contends that the district court erred in overruling the motion for new trial because she received ineffective assistance of counsel during the plea bargaining process

6

and she was not properly informed about the consequences of a deadly weapon finding.  We will address each of these issues in turn.

***Deadly Weapon Finding***

In her first two issues appellant contends that the evidence is legally and factually insufficient to support the district court's finding that the knife appellant held against Heaston's throat was a deadly weapon.

The test for legal sufficiency is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981).  When conducting a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses.  *See Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.).  A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the finding is so obviously weak or greatly outweighed by contrary proof as to undermine the trier of fact's determination.  *See Johnson v. State*, 23 S.W.3d 1, 11-12 (Tex. Crim. App. 2000).  The finding may be set aside only if it is clearly wrong and unjust.  *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996).

An instrument is a "deadly weapon" if it is:

(A) a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

7

Tex. Pen. Code Ann. § 1.07(a)(17) (West 1994).

The knife appellant held against Heaston's neck was not manifestly designed to cause serious bodily injury, therefore, it was not per se a deadly weapon. *Davidson v. State*, 602 S.W.2d 272, 273 (Tex. Crim. App. 1980); *Victor v. State*, 874 S.W.2d 748, 751 (Tex. App.—Houston [1st Dist.] 1994, pet. denied). When, as in this case, there was not a death or any serious bodily injury, the State must show that the knife was (1) capable of causing serious bodily injury and (2) that it was displayed or used in a manner that established the intent to use the knife to cause death or serious bodily injury. *Lockett v. State*, 874 S.W.2d 810, 814 (Tex. App.—Dallas 1994, pet. ref'd).

Factors that may be considered in determining whether a knife is a deadly weapon are the manner of its use, its size and shape, and its capacity to produce death or serious bodily injury. *Davidson*, 602 S.W.2d at 273. Additionally, the physical proximity between the victim and the knife may be considered. *Tisdale v. State*, 686 S.W.2d 110, 115 (Tex. Crim. App. 1984). Also, any threats or words used by the defendant may be considered by the finder of fact to determine whether the knife is a deadly weapon. *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983). No one factor is determinative and the evidence presented in each case must be examined to determine whether the finder of fact could have concluded from the surrounding circumstances that the knife used was a deadly weapon. *Brown v. State*, 717 S.W.2d 939, 947 (Tex. Crim. App. 1986).

In this case, appellant repeatedly held Heaston against her will while holding the knife. During the incident, appellant was very angry and several times she yelled obscenities at Heaston

while holding the knife against her throat. Initially, she grabbed Heaston around the neck with her left arm and displayed the knife in her right hand and forced Heaston to move from room to room in the house. Later, she again grabbed Heaston around the neck and held the knife close to her throat. Appellant then forced Heaston outside while holding the knife next to Heaston's throat. Heaston testified that she feared serious bodily injury or death from appellant repeatedly holding the knife against her throat while appellant was in an agitated state.

There was no testimony about the length of the knife but it was admitted as evidence[2] and the district court had the opportunity to handle the knife and evaluate its capabilities. The only reference to the sharpness of the knife was appellant's testimony that it was not sharp. Appellant contended that, as the handle was broken, most of the blade was inside her grasp and so only a small portion of the blade actually protruded from her hand. Officer Canizales testified that based on his experience, the knife was capable of inflicting serious bodily injury or death. Appellant testified that she did not intend to harm Heaston.

Even if a defendant did not intend to use deadly force, an object can nevertheless be a deadly weapon if a defendant used the knife in a manner in which it would have been capable of causing death or serious bodily injury. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). Consequently, appellant's lack of actual intent to cause serious bodily injury does not

---

[2] While the actual knife appellant used in committing the offense was admitted at trial, the appellate record contains only a photograph of the knife. Appellant has filed a motion requesting that the actual knife be submitted as a supplemental record for this Court's review. We note that as the trial was to the court, the trial judge, as the finder of fact, reviewed the knife. On appeal we allow deference to the finder of fact regarding a determination that a knife is a deadly weapon. We overrule appellant's motion requesting that the actual knife be submitted to this Court as a supplemental record.

conclusively establish that the knife was not a deadly weapon. Heaston testified that she feared that the knife could cause her serious bodily injury or death. Although appellant did not threaten Heaston with harm verbally, and, even assuming appellant did not actually intend to harm Heaston, a trier of fact could reasonably have determined that appellant's actions of holding the knife against Heaston's throat together with her agitated demeanor, her erratic behavior, and her statements to Heaston suggested that she displayed or used the knife in a manner that established the intent to use the knife to cause serious bodily injury or death.

Viewing the evidence in the light most favorable to the finding, we hold that a rational trier of fact could have found beyond a reasonable doubt that the knife was a deadly weapon. Additionally, we hold that the evidence supporting the deadly weapon finding is not so weak as to render the finding clearly wrong or manifestly unjust. The evidence is legally and factually sufficient to support the district court's finding that appellant used a deadly weapon. Appellant's first and second issues are overruled.

### Susan Roller's Testimony

In her third issue, appellant contends that the State wrongfully obtained information about appellant's threat to Susan Roller, appellant's former therapist and, therefore, pursuant to article 38.23 of the Texas Code of Criminal Procedure, Roller's testimony was improperly admitted at trial. Tex. Code Crim. Proc. Ann. art. 38.23 (West Supp. 2001) (Texas exclusionary rule). Appellant contends that the State wrongfully discovered the incident involving appellant and Roller through Heaston's written statement to police in which Heaston stated that appellant told her before attacking her that she previously had threatened Roller with a knife. Appellant contends that because

10

she never gave Heaston consent to disclose the incident with Roller, Heaston violated section 611.002 of the Health and Safety Code, a statutory confidentiality provision, the State wrongfully discovered the information through Heaston's statement, and therefore, Roller's testimony was improperly admitted at trial. *See* Tex. Health & Safety Code Ann. § 611.002 (West Supp. 2001). Appellant did not raise this objection at trial.

The Texas exclusionary rule provides,

> No evidence *obtained* by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex. Code Crim. Proc. Ann. art. 38.23(a) (emphasis added). The exclusionary rule may not be invoked for statutory violations unrelated to its purpose. *See Watson v. State*, 10 S.W.3d 782, 784 (Tex. App.—Austin 2000, no pet.). The stated purpose of the exclusionary rule is to deter police activity that could not have been reasonably believed to be lawful by officers engaging in the activity. *See Drago v. State*, 553 S.W.2d 375, 378 (Tex. Crim. App. 1977). This Court has stated that a more accurate expression of article 38.23's "primary purpose . . . is to deter unlawful actions which violate the rights of criminal suspects." *Watson*, 10 S.W.3d at 784 (citing *Carroll v. State*, 911 S.W.2d 210, 211 (Tex. App.—Austin 1995, no pet.)). To "obtain" means to gain or attain by planned action or effort. *State v. Daugherty*, 931 S.W.2d 268, 270-71 (Tex. Crim. App. 1996); *Carroll v. State*, 911 S.W.2d 210, 220 (Tex. App.—Austin 1995, no pet.) (citing Black's Law Dictionary 1078 (6th Ed. 1990)).

Here, the police did not actively procure or obtain the information about Roller from Heaston. Further, in July 1990, at the time appellant threatened Roller, Roller notified the police, filed a police report, and the police conducted an investigation. Although Roller did not press charges against appellant, the police had in their possession information regarding appellant's incident with Roller before Heaston ever made her statement. The police did not violate article 38.23 in obtaining information about appellant's incident with Roller. Appellant's third issue is overruled.

Because we have overruled appellant's contention that Roller's testimony was admitted wrongly, we also overrule appellant's fourth issue contending that trial counsel was ineffective for failing to object to the testimony.

### Claim of Ineffective Assistance of Counsel Related to the Effects of a Deadly Weapon Finding

In her fifth and sixth issues, appellant contends that she received ineffective assistance of counsel because her trial attorney failed to explain that if she elected to go to trial before the court and if the judge found that she used deadly weapon, she would be ineligible for probation and ineligible for parole for a mandatory time period. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 3G(a)(2) (West Supp. 2001); Tex. Gov't Code Ann. § 508.145(d) (West 1998). She contends that if she had fully understood the consequences of the judge making a deadly weapon finding, she would have elected a jury trial. Additionally, she contends she would have accepted a plea bargain for jail time. All of these issues were raised for the first time in appellant's motion for new trial. Following

12

an evidentiary hearing during which appellant, appellant's trial attorney and the prosecutor testified about these issues, the district court overruled the motion.[3]

The granting or overruling of a motion for new trial lies within the discretion of the trial court. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). Accordingly, the trial judge is the sole judge of the credibility of the witnesses. *Id.* If there is conflicting evidence, and the resolution of the conflict depends upon the credibility of witnesses and their testimony, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial. *Id.*

To prevail on an ineffective assistance of counsel contention, a defendant bears the burden of showing (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Jackson v. State,* 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). To prove deficiency, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness or deviated from prevailing professional norms. *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance should be highly deferential. *Strickland*, 466 U.S. at 689. Counsel's performance is not evaluated in hindsight, but from counsel's perspective at the time of the proceeding. *Id.* A defendant must overcome a strong presumption that an attorney's actions were

---

[3] There is no issue raised on appeal that appellant's trial counsel was ineffective because he failed to raise insanity as a defense or because he failed to challenge appellant's competency to stand trial. The record reflects that during the punishment hearing, appellant introduced exhibit three, a psychiatrist's report, in which the psychiatrist stated that after evaluating appellant it was his belief that she was not insane at the time she committed the offense. Additionally, the only reference to appellant's competency to stand trial occurred at the hearing on the motion for new trial when the trial judge stated, "The Court is going to take judicial notice of the findings by [the psychiatrist] in this case, that [appellant] was competent to stand trial and she understood the charges against her and could communicate with her lawyer." We do not address these issues as they are not before us for review.

sound trial strategy. *Id.*; *Jackson*, 877 S.W.2d at 771. A defense counsel's trial strategy should not be second-guessed, nor will the fact that another attorney might have pursued a different course support a determination that counsel was ineffective. *Jackson*, 877 S.W.2d at 771; *Delrio v. State*, 840 S.W.2d 443 (Tex. Crim. App. 1992); *Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979). We review the totality of the representation, rather than isolated acts or omissions. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986).

At the hearing, appellant testified that she did not learn about the State's deadly weapon allegation until *after* trial commenced. Appellant's trial attorney testified that although he did not send appellant a copy of the State's written notice raising the deadly weapon issue, he informed her about the issue and discussed with her the various aspects of the deadly weapon issue before she waived a jury trial. According to him, he specifically told her before she waived a jury trial that if she elected to go to trial before the court and if the judge found she used a deadly weapon she would be ineligible for probation and would have to serve a mandatory minimum portion of any prison sentence assessed. At the hearing, appellant's attorney explained the plea negotiations:

Q: Did you engage in plea negotiations with the State of Texas?

A: When I was first appointed to the case, I believed that she was not—that we should be able to settle this on some kind of misdemeanor sentencing, send her to jail for a year or something. I just couldn't believe that the facts warranted that. And I think I communicated that to her.

Mr. Bishop was so adamant that he was not—not only did he not want a misdemeanor, but he wouldn't grant a probation. And so that—when it became clear that a misdemeanor was not available and that the only way that we could get probation was to go to trial, I did communicate that to Ms. Williams and I never got a specific number of years from Mr. Bishop because the issue was

14

whether or not she, you know, she wanted probation. And I thought she deserved probation, quite frankly.

Appellant's counsel further testified about his trial strategy during the following exchange:

Q: Did you advise her to take this case to trial on a plea of not guilty?

A: It was my advice that she should try it in front of a judge rather than a jury because the jury was unpredictable and that I thought the judge was more reasonable. And it was my opinion that the judge would not find that rusted blade a deadly weapon, but, you know.

Q: You told her that before she waived the jury?

A: Yes.

During cross-examination, appellant's trial attorney stated that in looking back, he was not sure if appellant understood all of the consequences of a deadly weapon finding by a trial judge.

The foregoing reflects that appellant's trial attorney believed the case warranted probation or, at most, a minimal prison sentence. His impression was that appellant wanted only probation and did not want to serve any prison time. The State made it clear to him during plea negotiations that it would not consider offering a plea bargain that included probation. Despite appellant's attorney's testimony that, in hindsight he questioned appellant's understanding of all of the consequences of a deadly weapon finding by the judge, we evaluate appellant's trial attorney's performance from his perspective at the time of the plea-bargain process. Considering the positions of the parties, apparently appellant's trial attorney believed at the time that the only chance to obtain probation was to suggest to appellant that she go to trial before the court and that perhaps the judge would find the knife she used was not a deadly weapon and would then assess a probated prison sentence. Further,

15

while there was conflicting testimony about when appellant's attorney informed appellant about the deadly weapon finding, we must defer to the trial court's credibility determination that appellant was informed about the consequences of a deadly weapon finding before she waived a jury trial. *See Quinn v. State*, 958 S.W.2d 395, 401-02 (Tex. Crim. App. 1997); *Valdez v. State*, 893 S.W.2d 721, 724 (Tex. App.—Austin 1995, pet. ref'd). Given the positions taken by the parties prior to trial, appellant has not overcome the strong presumption that her attorney's actions were sound trial strategy. We hold that appellant has not shown that her trial attorney's performance fell below an objective standard of reasonableness. Appellant's fifth and sixth issues are overruled. The judgment is affirmed.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: November 29, 2001

Do Not Publish