

# NUMBER 13-08-092-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**BRYAN IRAN GARLEY,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

### On appeal from the 377th District Court
### of Victoria County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Vela

A jury found appellant, Bryan Iran Garley, guilty of burglary of a habitation, a second-degree felony, *see* TEX. PENAL CODE ANN. § 30.02(a)(3), (c)(2) (Vernon 2003), and injury to a child, a state jail felony. *See* § 22.04(a)(3), (f) (Vernon Supp. 2008). The jury found that appellant was a repeat offender and assessed punishment at thirty-five years'

imprisonment and a $10,000 fine,[1] and two years' confinement in a state jail facility and a $1,000 fine, respectively, with the sentences to run concurrently. By two issues, appellant complains the trial court erred by denying his motion for a mistrial, and he challenges the factual sufficiency of the evidence to support his burglary conviction.[2] We affirm.

## I. Factual Background

### A. State's Evidence

On July 6, 2007, Jason Nunez and appellant were attending a "get-together" when appellant asked him for a ride to his girlfriend's apartment located at the Creekstone Ranch Apartments in Victoria. Appellant told Nunez he wanted to go there to pick up some clothes. Nunez took him to the apartment complex and dropped him off there. At that time, Margo Goode was upstairs in her apartment when her daughter, A.G., ran to her and said, "'Mommy, mommy, I heard a noise.'" Goode did not believe her, but when Goode heard what sounded like glass breaking, she locked herself and A.G. in a bedroom and called 911. Appellant kicked in the bedroom door, grabbed Goode's arms, and threw her to the bed. Goode testified that when he grabbed her arms, she felt pain. He told her, "[W]e need to leave." Goode told him, "no," and when she got up from the bed, he pushed her against a wall. He grabbed A.G. and took her to Goode's car. Appellant, A.G., and Goode got into the car. Then, Goode got out of the car and started beating on the hood. When the police arrived, Goode took off running. Appellant also ran away. Goode ran to a neighbor's house and heard the neighbor say, "'Oh, my God. There he is.'" The neighbor locked the door, and while Goode had her back against a wall, appellant came

---

[1]*See* TEX. PENAL CODE ANN. § 12.42(b) (Vernon Supp. 2008).

[2]The State did not file an appellate brief in this case.

up to her and asked why she did not want to be with him. At that point, the police arrested him. Goode testified she did not give appellant consent to enter her apartment.

On cross-examination, Goode testified that prior to this incident, she and appellant had a three-month-long relationship and that he had never harmed her during this relationship. He had left some personal property in Goode's apartment, and when this incident occurred, his property was still there. Goode testified that when appellant kicked in the bedroom door, the door hit her in the chin and chest. However, she testified appellant never threatened to hurt her or A.G. She said that because appellant was taking A.G. out of the apartment, she had "no choice but to follow." She said that she unlocked her car and got into the driver's seat. Appellant told her to pick a place to go, but he did not say he wanted her to take him to any particular place. After the incident she talked to Detective Natasha Kolar and told her that she had not felt pain and had no injuries.

Officers Joseph Felan and Jefferson Hobbs responded to Goode's 911 call. Upon arriving at the apartment complex, they saw Goode standing at the driver's side door of a vehicle. Appellant was in the vehicle's driver's seat, holding onto Goode's arm. Goode was screaming, "'Let me go.'" When Officer Felan ordered appellant to get out of the vehicle, appellant ran away. Both officers gave chase. When Officer William Whitfield, another responding officer, arrived at the scene, he saw appellant walking. Officer Whitfield testified that he identified himself as "an officer" and told appellant to stop, but appellant "turned and started running back the other way." Appellant jumped over a fence and ran towards an apartment building. At that time, Goode was standing on the porch of the apartments. Appellant ran up to her and pinned her up against the wall with his arms. Officer Whitfield pulled him away from her, and he and Officer Hobbs handcuffed him.

3

Raul Liendo, a firefighter and paramedic, responded to the scene "to check on an individual that may have some injuries to the hands." Liendo could not recall this person's name. Liendo described the person as a black male, "[a]bout 5' 10", 5' 11." Liendo testified that "we checked his hands. He was already cut." He also testified that there was "a lady" at the scene who had no injuries.

Afterwards, Officer Whitfield went inside Goode's apartment. When the prosecutor asked him, "Can you describe what the window looked like, sir?", he said, "It was broken. It looked like somebody broke it out." When the prosecutor asked him, "Did you see any indications that an individual that had broken this window had entered the apartment?", he replied in the affirmative and stated that he saw "blood throughout the apartment." He followed a trail of blood to a bedroom. He testified the door to this bedroom looked like it had been forced open.

After the incident, appellant was incarcerated in the Victoria County Jail. Goode continued to have contact with him through letters, personal visits, and telephone calls. She told him a couple of times she was going to drop the charges. However, she testified she told him this because she was "scared." She also put money into an account so that appellant could call her. She did this because she "was scared and I know people he knows. I was very, very scared. . . ."

Detective Natasha Kolar arrived at Goode's apartment shortly after the incident. Inside the apartment's first floor, she saw blood on the window blinds. The screen was off the window, and the glass was broken. She testified that on the second floor, "the child's" bedroom door had been "kicked in."

On cross-examination, she testified her police report stated she saw no physical injuries to either Goode or A.G. She testified Goode "advised me that she did not feel

4

pain." Detective Kolar stated there was no evidence of a theft.

*B. Appellant's Evidence*

Appellant's mother, Lilly Robinson, testified that appellant and Goode were boyfriend and girlfriend, and that Goode and appellant used to come over to her house to watch movies. Robinson said that A.G. "considered [appellant] as her daddy" and that A.G. "always called him her daddy." She believed that appellant loved A.G.

Johnny Valadez, a sergeant with the Victoria County Sheriff's Office, supervised some visitations between appellant and Goode. At some point, "officers" told him appellant was "visiting the victim." Sergeant Valadez testified that because of appellant's bond conditions, "I advised her [Goode], until I get paperwork from the DA or across the street from here, that the charges were dismissed, [appellant] couldn't visit her again." Goode told Sergeant Valadez that she was going to drop the charges on appellant. He testified that Goode did not seem to be scared or coerced.

Appellant's aunt, Iris Dorsey, testified that after July 6, 2007, she had occasion to receive phone calls either from or to Goode. Dorsey said that for a period of time, she would receive four calls "[o]n a night." She stated she had never threatened Goode and had not done anything to make her scared.

The defense called Goode to the witness stand in order to ask her the following:

Q. Ms. Goode . . . Isn't it true that, in the past, after July 6, you told my client [appellant]—Let me give you the context and see if you recall this. He [appellant] had asked you about some of the allegations you had made and your response—Isn't it true that your response was, "What you read is nothing that I said. They told me to do that. They told me to say that"; is that correct?

A. Yes, sir.

Q. When you are talking about "they," you are referring to law enforcement?

5

A. Actually—Honestly, I wasn't referring to anybody. I was just saying that. There really wasn't anybody to refer to.

Q. But that's–

A. I guess, if you put it in context, that's who it would have referred to.

Q. And that's what you said?

A. Yes, sir.

She testified the reason she told Sergeant Valadez she was going to drop the charges was "because I was scared" of appellant.

On re-direct examination, when the prosecutor asked her, "[I]s it still your testimony that the defendant assaulted you inside your apartment, by causing physical contact that caused you bodily injury?", she said, "Yes, sir." When the prosecutor asked her, "Physical contact that was offensive to you or provocative?", she said, "Yes, sir."

Detective Kolar testified appellant was accused of kicking in A.G.'s bedroom door. However, when defense counsel showed her a photograph of that door, Detective Kolar could not see any damage to the actual door jamb or around the door knob. She testified that when a door is forced open, "[t]here can be damage" around the door knob or door jamb.

## II. Discussion

*A. Motion For Mistrial*

In his first issue, appellant argues the trial court erred in denying his motion for a mistrial. After the jury was sworn but before the State called its first witness in its case-in-chief, defense counsel, outside the jury's presence, requested a mistrial. Counsel told the trial court that as he was getting ready for that morning's proceedings, he saw one of the testifying officers, Jefferson Hobbs, speaking to Lyn Billstein, one of the jurors in this case.

Counsel again requested a mistrial and stated that if the court did not grant a mistrial, he wanted to put on evidence regarding the conversation. Without ruling on the request for a mistrial, the court allowed counsel to call Officer Hobbs as a witness.

Officer Hobbs testified that on that morning, he had a conversation with a woman in front of the courthouse. He described her as having "kind of curly, probably shoulder length" blonde hair. He stated "she asked me if Jason still worked for the department." When he asked, "'Jason who?'", she said, "'Jason Mikeska.'" Officer Hobbs told her, "'Yes, ma'am. He works on the shift I work on.'" The woman told Officer Hobbs she had known Jason for many years and asked Officer Hobbs to tell Jason that "Lynn said 'Hello.'" Officer Hobbs testified, "So, I wrote 'Lynn' on my note." When counsel asked Officer Hobbs if the woman gave him a last name, he said:

> A.   No, sir. She just said it was "Brashier" or some name with a "B's" mom and that Jason would know who it was.
>
> Q.   I'm sorry? Would you repeat that?
>
> A.   She said she was a "Brasheer" or "Brasheir," or stated some name with a "B," and that she was that female's mom, and that Jason would know who I was talking about.
>
> Q.   So, she asked you to do her a favor by going and saying "Hello" to another officer you work with?
>
> A.   Correct.
>
> Q.   And you told her you would do that favor for her?
>
> A.   I said, "Surely."
>
> Q.   What other discussions did you have with that juror?
>
> A.   That was it. She said she was here for jury duty and we separated ways.
>
> Q.   When did she state she was here for jury duty?

A. That was the last thing she stated. She didn't state what case or anything of that nature.

Officer Hobbs testified he is a witness in this case and that at the time he spoke to the woman, he did not know she was a juror.

After counsel ended his interrogation of Officer Hobbs, he told the court he was not going to call any more witnesses. The trial court denied the motion for a mistrial.

*1. Applicable Law*

We review a trial court's ruling on a motion for mistrial under an abuse-of-discretion standard. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *Rojas v. State*, 171 S.W.3d 442, 450 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Article 36.22 of the code of criminal procedure, titled "Conversing with jury," states, in relevant part, that "[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22 (Vernon 2006); *see also* Tex. R. App. P. 21.3(f) (providing that a defendant must be granted a new trial when a juror has talked with anyone about the case).

For a defendant to have a fair trial, the jury must decide his or her case on the basis of the evidence presented at trial. *Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991). Thus, when jurors talk to an unauthorized person about a case, injury to the defendant is presumed, and a mistrial may be warranted. *Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997); *Robinson*, 851 S.W.2d at 230. If the presumption of harm arises, the State has the burden to rebut the presumption by showing no injury or prejudice to the accused. *Klapesky v. State*, 256 S.W.3d 442, 452 (Tex. App.–Austin 2008, pet. ref'd); *see also Quinn*, 958 S.W.2d at 401. However, the defendant bears the initial burden to show that a conversation about the case occurred between a juror and an unauthorized

8

person.  *Klapesky*, 256 S.W.3d at 452; *see Chambliss v. State*, 647 S.W.2d 257, 265-66 (Tex. Crim. App. 1983) (with respect to article 36.22, "the defendant has the burden 'to establish that if a conversation did occur between a nonsequestered juror and someone else . . . the discussion involved matters *concerning the specific case at trial*.'") (emphasis in original).  In determining whether the State rebutted the presumption of harm, we defer to the trial court's resolution of the historical facts and its determinations concerning credibility and demeanor.  *Quinn*, 958 S.W.2d at 401.  We view the evidence in a light most favorable to the trial court's ruling.  *Id*. at 402.

### 2. Analysis

Appellant did not prove the conversation between Officer Hobbs and juror Billstein concerned this case; accordingly, injury will not be presumed.  *See Klapesky*, 256 S.W.3d at 452; *see also Chambliss,* 647 S.W.2d at 265-66.  According to Officer Hobbs, the conversation concerned Billstein asking him to tell someone hello.  Counsel did not call Billstein as a witness.  This issue turns on witness credibility, and we give almost total deference to the trial court's resolution of such issues.  *See Quinn*, 958 S.W.2d at 401.  Viewing the evidence in the light most favorable to the trial court's ruling, we do not find that the juror "talked with anyone about the case."  *See* TEX. R. APP. P. 21.3(f).  Therefore, we hold the trial court did not abuse its discretion in denying the motion for a mistrial.  We overrule issue one.

### B. Factual Sufficiency

In his second issue, appellant challenges the factual sufficiency of the evidence to support his conviction for burglary of a habitation.  An appellate court must begin a factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Laster v. State*, No. PD-1276-07, 2009 WL 80226 at *2

9

(Tex. Crim. App. Jan. 14, 2009) (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (citing *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996)). However, evidence that is legally sufficient can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support the factfinder's verdict;" or (2) "considering conflicting evidence, the factfinder's verdict is 'against the great weight and preponderance of the evidence.'" *Id*. (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual sufficiency review, the court must defer to the jury's findings. *Id*. (citing *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.2d at 414). First, the appellate court must consider all of the evidence in a neutral light,[3] as opposed to in a light most favorable to the verdict. *Id*. (citing *Watson*, 204 S.W.3d at 414). Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain*, 958 S.W.2d at 407). Although the verdict is afforded less deference during a factual sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*. (citing *Cain*, 958 S.W.2d at 407). Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. *Id*. (citing *Watson*, 204 S.W.3d at 414).

"In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'"

---

[3]*Laster v. State*, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14, 2009) (citing *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)).

10

*Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)); *Thompson v. State*, 697 S.W.2d 413, 416 (Tex. Crim. App. 1985). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are [sic] sufficient to support the conviction." *Id*. (citing *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)).

### 1. Burglary Of A Habitation

The penal code provides that "(a) A person commits an offense if, without the effective consent of the owner, the person: . . . (3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." TEX. PENAL CODE ANN. § 30.02(a)(3) (Vernon 2003). With respect to burglary of a habitation, "'enter' means to intrude: (1) any part of the body . . . ." *Id*. § 30.02(b)(1).

Here, the charge instructed the jury it could convict appellant of burglary of a habitation if they found he "intentionally or knowingly entere[d] a habitation without the effective consent of MARGO GOODE, the owner thereof, and committed an assault against MARGO GOODE . . . ."

A person commits the offense of assault if he or she: "(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." *Id*. § 22.01(a)(1)-(3) (Vernon Supp. 2008). "'Bodily injury' means physical pain, illness, or any impairment of physical condition." *Id*. § 1.07(a)(8).

11

*2. Analysis*

The evidence showed that Goode heard the sound of glass breaking and locked herself and A.G. in an upstairs bedroom. When appellant kicked in the bedroom door, it hit Goode in the chin and chest. Appellant grabbed Goode's arms, which caused her pain, and threw her to the bed. When she got up from the bed, he pushed her against a wall. Officer Whitfield saw a broken window in Goode's apartment and a blood trail leading up the stairs to A.G.'s room. Detective Kolar saw that the screen was off the window. Goode testified she did not give appellant consent to enter her apartment and that he assaulted her inside her apartment, by causing physical contact that caused her bodily injury and that was offensive or provocative to her.

The contrary evidence showed: (1) prior to the incident, Goode and appellant had a boyfriend-girlfriend relationship; (2) appellant went to Goode's apartment to retrieve some clothing he had left there; (3) appellant did not threaten to harm Goode or A.G.; (4) Goode suffered no injuries during the incident; (5) when police arrived, appellant fled from the scene, but then returned to the scene; (6) after the incident, Goode continued to contact appellant and said she wanted to drop the charges against him; and (7) Goode told Detective Kolar that she was not feeling any pain.

Viewing the evidence neutrally, we conclude that the evidence supporting the conviction is not so weak that the fact finder's determination is clearly wrong and manifestly unjust, or that the verdict is against the great weight and preponderance of the evidence. We overrule the second issue.

## III. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 2nd day of April, 2009.