NUMBER 13-08-092-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


BRYAN IRAN GARLEY, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 377th District Court 

of Victoria County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Garza and Vela


Memorandum Opinion by Justice Vela



 A jury found appellant, Bryan Iran Garley, guilty of burglary of a habitation, a
second-degree felony, see Tex. Penal Code Ann. § 30.02(a)(3), (c)(2) (Vernon 2003), and
injury to a child, a state jail felony. See § 22.04(a)(3), (f) (Vernon Supp. 2008). The jury
found that appellant was a repeat offender and assessed punishment at thirty-five years'
imprisonment and a $10,000 fine, (1) and two years' confinement in a state jail facility and a
$1,000 fine, respectively, with the sentences to run concurrently. By two issues, appellant
complains the trial court erred by denying his motion for a mistrial, and he challenges the
factual sufficiency of the evidence to support his burglary conviction. (2) We affirm.

I. Factual Background


A. State's Evidence

 On July 6, 2007, Jason Nunez and appellant were attending a "get-together" when
appellant asked him for a ride to his girlfriend's apartment located at the Creekstone Ranch
Apartments in Victoria. Appellant told Nunez he wanted to go there to pick up some
clothes. Nunez took him to the apartment complex and dropped him off there. At that
time, Margo Goode was upstairs in her apartment when her daughter, A.G., ran to her and
said, "'Mommy, mommy, I heard a noise.'" Goode did not believe her, but when Goode
heard what sounded like glass breaking, she locked herself and A.G. in a bedroom and
called 911. Appellant kicked in the bedroom door, grabbed Goode's arms, and threw her
to the bed. Goode testified that when he grabbed her arms, she felt pain. He told her,
"[W]e need to leave." Goode told him, "no," and when she got up from the bed, he pushed
her against a wall. He grabbed A.G. and took her to Goode's car. Appellant, A.G., and
Goode got into the car. Then, Goode got out of the car and started beating on the hood. 
When the police arrived, Goode took off running. Appellant also ran away. Goode ran to
a neighbor's house and heard the neighbor say, "'Oh, my God. There he is.'" The
neighbor locked the door, and while Goode had her back against a wall, appellant came
up to her and asked why she did not want to be with him. At that point, the police arrested
him. Goode testified she did not give appellant consent to enter her apartment.

 On cross-examination, Goode testified that prior to this incident, she and appellant
had a three-month-long relationship and that he had never harmed her during this
relationship. He had left some personal property in Goode's apartment, and when this
incident occurred, his property was still there. Goode testified that when appellant kicked
in the bedroom door, the door hit her in the chin and chest. However, she testified
appellant never threatened to hurt her or A.G. She said that because appellant was taking
A.G. out of the apartment, she had "no choice but to follow." She said that she unlocked
her car and got into the driver's seat. Appellant told her to pick a place to go, but he did
not say he wanted her to take him to any particular place. After the incident she talked to
Detective Natasha Kolar and told her that she had not felt pain and had no injuries.

 Officers Joseph Felan and Jefferson Hobbs responded to Goode's 911 call. Upon
arriving at the apartment complex, they saw Goode standing at the driver's side door of a
vehicle. Appellant was in the vehicle's driver's seat, holding onto Goode's arm. Goode
was screaming, "'Let me go.'" When Officer Felan ordered appellant to get out of the
vehicle, appellant ran away. Both officers gave chase. When Officer William Whitfield,
another responding officer, arrived at the scene, he saw appellant walking. Officer
Whitfield testified that he identified himself as "an officer" and told appellant to stop, but
appellant "turned and started running back the other way." Appellant jumped over a fence
and ran towards an apartment building. At that time, Goode was standing on the porch of
the apartments. Appellant ran up to her and pinned her up against the wall with his arms. 
Officer Whitfield pulled him away from her, and he and Officer Hobbs handcuffed him.


 Raul Liendo, a firefighter and paramedic, responded to the scene "to check on an
individual that may have some injuries to the hands." Liendo could not recall this person's
name. Liendo described the person as a black male, "[a]bout 5' 10", 5' 11." Liendo
testified that "we checked his hands. He was already cut." He also testified that there was
"a lady" at the scene who had no injuries.

 Afterwards, Officer Whitfield went inside Goode's apartment. When the prosecutor
asked him, "Can you describe what the window looked like, sir?", he said, "It was broken. 
It looked like somebody broke it out." When the prosecutor asked him, "Did you see any
indications that an individual that had broken this window had entered the apartment?", he
replied in the affirmative and stated that he saw "blood throughout the apartment." He
followed a trail of blood to a bedroom. He testified the door to this bedroom looked like it
had been forced open.

 After the incident, appellant was incarcerated in the Victoria County Jail. Goode
continued to have contact with him through letters, personal visits, and telephone calls. 
She told him a couple of times she was going to drop the charges. However, she testified
she told him this because she was "scared." She also put money into an account so that
appellant could call her. She did this because she "was scared and I know people he
knows. I was very, very scared. . . ."

 Detective Natasha Kolar arrived at Goode's apartment shortly after the incident. 
Inside the apartment's first floor, she saw blood on the window blinds. The screen was off
the window, and the glass was broken. She testified that on the second floor, "the child's"
bedroom door had been "kicked in." 

 On cross-examination, she testified her police report stated she saw no physical
injuries to either Goode or A.G. She testified Goode "advised me that she did not feel
pain." Detective Kolar stated there was no evidence of a theft. 

B. Appellant's Evidence

 Appellant's mother, Lilly Robinson, testified that appellant and Goode were
boyfriend and girlfriend, and that Goode and appellant used to come over to her house to
watch movies. Robinson said that A.G. "considered [appellant] as her daddy" and that
A.G. "always called him her daddy." She believed that appellant loved A.G.

 Johnny Valadez, a sergeant with the Victoria County Sheriff's Office, supervised
some visitations between appellant and Goode. At some point, "officers" told him appellant
was "visiting the victim." Sergeant Valadez testified that because of appellant's bond
conditions, "I advised her [Goode], until I get paperwork from the DA or across the street
from here, that the charges were dismissed, [appellant] couldn't visit her again." Goode
told Sergeant Valadez that she was going to drop the charges on appellant. He testified
that Goode did not seem to be scared or coerced.

 Appellant's aunt, Iris Dorsey, testified that after July 6, 2007, she had occasion to
receive phone calls either from or to Goode. Dorsey said that for a period of time, she
would receive four calls "[o]n a night." She stated she had never threatened Goode and
had not done anything to make her scared.

 The defense called Goode to the witness stand in order to ask her the following:

 Q. Ms. Goode . . . Isn't it true that, in the past, after July 6, you told my
client [appellant]--Let me give you the context and see if you recall
this. He [appellant] had asked you about some of the allegations you
had made and your response--Isn't it true that your response was,
"What you read is nothing that I said. They told me to do that. They
told me to say that"; is that correct?


 A. Yes, sir.


 Q. When you are talking about "they," you are referring to law
enforcement?


 A. Actually--Honestly, I wasn't referring to anybody. I was just saying
that. There really wasn't anybody to refer to.


 Q. But that's-


 A. I guess, if you put it in context, that's who it would have referred to.


 Q. And that's what you said?


 A. Yes, sir.


She testified the reason she told Sergeant Valadez she was going to drop the charges was
"because I was scared" of appellant. 

 On re-direct examination, when the prosecutor asked her, "[I]s it still your testimony
that the defendant assaulted you inside your apartment, by causing physical contact that
caused you bodily injury?", she said, "Yes, sir." When the prosecutor asked her, "Physical
contact that was offensive to you or provocative?", she said, "Yes, sir."

 Detective Kolar testified appellant was accused of kicking in A.G.'s bedroom door. 
However, when defense counsel showed her a photograph of that door, Detective Kolar
could not see any damage to the actual door jamb or around the door knob. She testified
that when a door is forced open, "[t]here can be damage" around the door knob or door
jamb.

II. Discussion


A. Motion For Mistrial

 In his first issue, appellant argues the trial court erred in denying his motion for a
mistrial. After the jury was sworn but before the State called its first witness in its case-in-chief, defense counsel, outside the jury's presence, requested a mistrial. Counsel told the
trial court that as he was getting ready for that morning's proceedings, he saw one of the
testifying officers, Jefferson Hobbs, speaking to Lyn Billstein, one of the jurors in this case. 
Counsel again requested a mistrial and stated that if the court did not grant a mistrial, he
wanted to put on evidence regarding the conversation. Without ruling on the request for
a mistrial, the court allowed counsel to call Officer Hobbs as a witness.

 Officer Hobbs testified that on that morning, he had a conversation with a woman
in front of the courthouse. He described her as having "kind of curly, probably shoulder
length" blonde hair. He stated "she asked me if Jason still worked for the department." 
When he asked, "'Jason who?'", she said, "'Jason Mikeska.'" Officer Hobbs told her, "'Yes,
ma'am. He works on the shift I work on.'" The woman told Officer Hobbs she had known
Jason for many years and asked Officer Hobbs to tell Jason that "Lynn said 'Hello.'" 
Officer Hobbs testified, "So, I wrote 'Lynn' on my note." When counsel asked Officer
Hobbs if the woman gave him a last name, he said:

 A. No, sir. She just said it was "Brashier" or some name with a "B's"
mom and that Jason would know who it was.


 Q. I'm sorry? Would you repeat that?


 A. She said she was a "Brasheer" or "Brasheir," or stated some name
with a "B," and that she was that female's mom, and that Jason would
know who I was talking about.


 Q. So, she asked you to do her a favor by going and saying "Hello" to
another officer you work with?


 A. Correct.


 Q. And you told her you would do that favor for her?


 A. I said, "Surely."


 Q. What other discussions did you have with that juror?


 A. That was it. She said she was here for jury duty and we separated
ways.


 Q. When did she state she was here for jury duty?


 A. That was the last thing she stated. She didn't state what case or
anything of that nature.


Officer Hobbs testified he is a witness in this case and that at the time he spoke to the
woman, he did not know she was a juror.

 After counsel ended his interrogation of Officer Hobbs, he told the court he was not
going to call any more witnesses. The trial court denied the motion for a mistrial.

 1. Applicable Law

 We review a trial court's ruling on a motion for mistrial under an abuse-of-discretion
standard. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); Rojas v. State, 171
S.W.3d 442, 450 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). Article 36.22 of the
code of criminal procedure, titled "Conversing with jury," states, in relevant part, that "[n]o
person shall be permitted to converse with a juror about the case on trial except in the
presence and by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22
(Vernon 2006); see also Tex. R. App. P. 21.3(f) (providing that a defendant must be
granted a new trial when a juror has talked with anyone about the case).

 For a defendant to have a fair trial, the jury must decide his or her case on the basis
of the evidence presented at trial. Robinson v. State, 851 S.W.2d 216, 230 (Tex. Crim.
App. 1991). Thus, when jurors talk to an unauthorized person about a case, injury to the
defendant is presumed, and a mistrial may be warranted. Quinn v. State, 958 S.W.2d 395,
401 (Tex. Crim. App. 1997); Robinson, 851 S.W.2d at 230. If the presumption of harm
arises, the State has the burden to rebut the presumption by showing no injury or prejudice
to the accused. Klapesky v. State, 256 S.W.3d 442, 452 (Tex. App.-Austin 2008, pet.
ref'd); see also Quinn, 958 S.W.2d at 401. However, the defendant bears the initial burden
to show that a conversation about the case occurred between a juror and an unauthorized
person. Klapesky, 256 S.W.3d at 452; see Chambliss v. State, 647 S.W.2d 257, 265-66
(Tex. Crim. App. 1983) (with respect to article 36.22, "the defendant has the burden 'to
establish that if a conversation did occur between a nonsequestered juror and someone
else . . . the discussion involved matters concerning the specific case at trial.'") (emphasis
in original). In determining whether the State rebutted the presumption of harm, we defer
to the trial court's resolution of the historical facts and its determinations concerning
credibility and demeanor. Quinn, 958 S.W.2d at 401. We view the evidence in a light most
favorable to the trial court's ruling. Id. at 402. 

 2. Analysis

 Appellant did not prove the conversation between Officer Hobbs and juror Billstein
concerned this case; accordingly, injury will not be presumed. See Klapesky, 256 S.W.3d
at 452; see also Chambliss, 647 S.W.2d at 265-66. According to Officer Hobbs, the
conversation concerned Billstein asking him to tell someone hello. Counsel did not call
Billstein as a witness. This issue turns on witness credibility, and we give almost total
deference to the trial court's resolution of such issues. See Quinn, 958 S.W.2d at 401. 
Viewing the evidence in the light most favorable to the trial court's ruling, we do not find
that the juror "talked with anyone about the case." See Tex. R. App. P. 21.3(f). Therefore,
we hold the trial court did not abuse its discretion in denying the motion for a mistrial. We
overrule issue one.

B. Factual Sufficiency

 In his second issue, appellant challenges the factual sufficiency of the evidence to
support his conviction for burglary of a habitation. An appellate court must begin a factual
sufficiency review with the assumption that the evidence is legally sufficient under Jackson
v. Virginia, 443 U.S. 307 (1979). Laster v. State, No. PD-1276-07, 2009 WL 80226 at *2
(Tex. Crim. App. Jan. 14, 2009) (citing Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996) (citing Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996)). 
However, evidence that is legally sufficient can be deemed factually insufficient in two
ways: (1) "the evidence supporting the conviction is 'too weak' to support the factfinder's
verdict;" or (2) "considering conflicting evidence, the factfinder's verdict is 'against the great
weight and preponderance of the evidence.'" Id. (quoting Watson v. State, 204 S.W.3d
404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual
sufficiency review, the court must defer to the jury's findings. Id. (citing Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997)). The court of criminal appeals has "set out three
'basic ground rules' implementing this standard." Id. (quoting Watson, 204 S.W.2d at 414). 
First, the appellate court must consider all of the evidence in a neutral light, (3) as opposed
to in a light most favorable to the verdict. Id. (citing Watson, 204 S.W.3d at 414). Second,
the appellate court "may only find the evidence factually insufficient when necessary to
'prevent manifest injustice.'" Id. (quoting Cain, 958 S.W.2d at 407). Although the verdict
is afforded less deference during a factual sufficiency review, an appellate court is not free
to "override the verdict simply because it disagrees with it." Id. (citing Cain, 958 S.W.2d
at 407). Third, the appellate court must explain why the evidence is too weak to support
the verdict or why the conflicting evidence greatly weighs against the verdict. Id. (citing
Watson, 204 S.W.3d at 414).

 "In reviewing the sufficiency of the evidence, we should look at 'events occurring
before, during and after the commission of the offense and may rely on actions of the
defendant which show an understanding and common design to do the prohibited act.'" 
Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (citing Cordova v. State, 698
S.W.2d 107, 111 (Tex. Crim. App. 1985)); Thompson v. State, 697 S.W.2d 413, 416 (Tex.
Crim. App. 1985). "Each fact need not point directly and independently to the guilt of the
appellant, as long as the cumulative effect of all the incriminating facts are [sic] sufficient
to support the conviction." Id. (citing Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim.
App. 1987)).

 1. Burglary Of A Habitation

 The penal code provides that "(a) A person commits an offense if, without the
effective consent of the owner, the person: . . . (3) enters a building or habitation and
commits or attempts to commit a felony, theft, or an assault." Tex. Penal Code Ann. §
30.02(a)(3) (Vernon 2003). With respect to burglary of a habitation, "'enter' means to
intrude: (1) any part of the body . . . ." Id. § 30.02(b)(1).

 Here, the charge instructed the jury it could convict appellant of burglary of a
habitation if they found he "intentionally or knowingly entere[d] a habitation without the
effective consent of MARGO GOODE, the owner thereof, and committed an assault
against MARGO GOODE . . . ."

 A person commits the offense of assault if he or she: "(1) intentionally, knowingly,
or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally
or knowingly threatens another with imminent bodily injury, including the person's spouse;
or (3) intentionally or knowingly causes physical contact with another when the person
knows or should reasonably believe that the other will regard the contact as offensive or
provocative." Id. § 22.01(a)(1)-(3) (Vernon Supp. 2008). "'Bodily injury' means physical
pain, illness, or any impairment of physical condition." Id. § 1.07(a)(8).


 2. Analysis

 The evidence showed that Goode heard the sound of glass breaking and locked
herself and A.G. in an upstairs bedroom. When appellant kicked in the bedroom door, it
hit Goode in the chin and chest. Appellant grabbed Goode's arms, which caused her pain,
and threw her to the bed. When she got up from the bed, he pushed her against a wall. 
Officer Whitfield saw a broken window in Goode's apartment and a blood trail leading up
the stairs to A.G.'s room. Detective Kolar saw that the screen was off the window. Goode
testified she did not give appellant consent to enter her apartment and that he assaulted
her inside her apartment, by causing physical contact that caused her bodily injury and that
was offensive or provocative to her.

 The contrary evidence showed: (1) prior to the incident, Goode and appellant had
a boyfriend-girlfriend relationship; (2) appellant went to Goode's apartment to retrieve some
clothing he had left there; (3) appellant did not threaten to harm Goode or A.G.; (4) Goode
suffered no injuries during the incident; (5) when police arrived, appellant fled from the
scene, but then returned to the scene; (6) after the incident, Goode continued to contact
appellant and said she wanted to drop the charges against him; and (7) Goode told
Detective Kolar that she was not feeling any pain.

 Viewing the evidence neutrally, we conclude that the evidence supporting the
conviction is not so weak that the fact finder's determination is clearly wrong and manifestly
unjust, or that the verdict is against the great weight and preponderance of the evidence. 
We overrule the second issue.




III. Conclusion


 We affirm the trial court's judgment. 



 

 ROSE VELA 

 Justice



Do not publish.

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and

filed this 2nd day of April, 2009.
1. See Tex. Penal Code Ann. § 12.42(b) (Vernon Supp. 2008).
2. The State did not file an appellate brief in this case.
3. Laster v. State, No. PD-1276-07, 2009 WL 80226 at *2 (Tex. Crim. App. Jan. 14, 2009) (citing
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006)).