

**NUMBER 13-09-00555-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**ERIC GARCIA,**                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                               **Appellee.**

### On appeal from the 148th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Vela, and Perkes**
**Memorandum Opinion by Justice Garza**

Appellant, Eric Garcia, was indicted for aggravated robbery, *see* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003), but a jury found him guilty of the lesser-included offense of aggravated assault, *see id.* § 22.02(a) (Vernon Supp. 2010). The trial court found the State's enhancement allegations of two prior felony convictions "true," and sentenced him to thirty years' imprisonment. *See id.* §§ 22.02(b), 12.42(d) (Vernon

Supp. 2010).  By four issues, appellant contends:  (1) the evidence is insufficient to support his conviction; (2) the trial court erred in admitting a photograph; (3) the trial court erred in denying his motion for mistrial based on alleged juror bias; and (4) the jury charge's application paragraph on the lesser-included offense of aggravated assault erroneously included the elements of the greater offense of aggravated robbery.  We affirm.

## I. BACKGROUND

### A.    The State's Evidence

On January 23, 2009, around 10:45 p.m., police officers responded to a 911 call from Elizabeth Ruiz regarding a home invasion and robbery by three suspects.  Ruiz was home with her husband, Darryl Rodriguez, and their children when the incident occurred.  We detail below relevant testimony presented by some of the State's witnesses.  The defense presented no witnesses.

### 1.   Darryl Rodriguez

Rodriguez testified that after hearing a noise, he went out the back of his house to investigate.  He was confronted by three men wearing hoodies and bandannas over their faces.  One of the men stuck a gun in his face.  The men started beating Rodriguez, and during the struggle, he fell and hit his head.  Rodriguez said he would give the men "whatever they want[ed]."  One of the men spotted Martin Ramos, a friend who was working in Rodriguez's garage, and escorted him into the house at gunpoint.[1] Two of the men held guns on Rodriguez and Ramos in the kitchen; the third man, also armed with a gun, went into a bedroom and confronted Ruiz.  Rodriguez opened the kitchen cabinet where he kept approximately $15,000 and a gun; when one of the men

---

[1] Martin Ramos's testimony was consistent with Rodriguez's as to the events that transpired.

2

was momentarily distracted, Rodriguez grabbed his gun from the cabinet and began firing. The two men returned fire. Rodriguez ran out of the kitchen and down the hallway. In the hallway, he was attacked by the third man, who picked him up and held him in a "choke hold." Rodriguez put his gun over his shoulder and fired once. The third man then ran out of the house. Rodriguez retrieved another gun and returned to the kitchen, where he saw one of the men on the floor reaching for his gun. Rodriguez shot him "a few more times," took his gun away, and told Ruiz to call the police. When the police arrived, they found one person dead outside near a maroon Lincoln Town Car. Rodriguez did not know any of the men involved in the incident.

### 2. Elizabeth Ruiz

Ruiz testified that she "knew something was wrong" when she saw a man with a bandanna over his face in her home. She ran to her bedroom, but one of the men followed, pointed a gun at her face, and told her to get on the floor. She saw the man "mess around" with the top of her dresser. Ruiz identified her wedding ring, which was later found on the seat of the Lincoln.

### 3. Detective Curtis Abbott

Curtis Abbott, a detective with the Corpus Christi police department, testified that when he arrived at the house, the crime scene had been secured by other patrol officers. One person was found dead in front of the house next to a maroon Lincoln. Detective Abbott said he observed blood in the street leading away from the residence. Other evidence was discovered nearby: a gun with blood on it was found in a trash can; a black bandanna was found in the yard, and a baseball cap was found behind some

3

bushes on a nearby street.[2]  In the course of investigating the incident, the police discovered marihuana and cocaine, along with numerous weapons in the Rodriguez house.  Detective Abbott testified that the deceased person was wearing latex gloves.  Another person found inside the house was suffering from multiple gunshot wounds and was transported for emergency medical treatment.  Shortly after the incident, on February 5, 2009, Detective Abbott met with appellant, and noticed that appellant's right arm was bandaged around the elbow and was in a sling.

### 4.  Robin Olson Castro

Robin Olson Castro, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Corpus Christi, testified that she performed DNA analysis on evidence collected in the case.  Blood sample evidence taken from the driveway of the residence, as well as samples taken from a nearby sidewalk, curb, and a curb in front of nearby Brawner Parkway, was consistent with Garcia's DNA profile.  Blood samples taken from the Lincoln, including the steering wheel and interior and exterior, were consistent with Garcia's DNA profile.  In addition, blood samples taken from the gun, baseball cap, and bandanna were consistent with Garcia's DNA profile.

### 5.  Katrina Aggeloupolous

Katrina Aggeloupoulous, a latent-print examiner with the Corpus Christi Police Department, testified that Garcia's prints were found on the exterior of the passenger's side of the Lincoln's windshield.

### 6.  State's Exhibit  9

The State also introduced and played for the jury an audio recording of a

---

[2] Other trial testimony established that the blood trail continued for approximately fifty to seventy-five yards.  The trash can containing the gun was approximately fifty yards from the house.

4

telephone call that appellant made to his mother from jail. During the call, appellant says that he was present at the Rodriguez house, but will not answer questions about others because he does not want anyone saying that he "snitched."

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. 2010) (plurality op.). Accordingly, we review claims of evidentiary sufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906-07, 912.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In order to prove that appellant committed the offense of

aggravated assault under section 22.02 of the penal code, as alleged in the indictment, the State was required to prove that (1) appellant (2) either acting alone or as a party[3]; (3) intentionally or knowingly; (4) threatened or placed Darryl Rodriguez in fear of imminent bodily injury or death; and (5) used or exhibited a firearm during the assault.[4]

## B. Discussion

Appellant's challenge to the sufficiency of the evidence is limited to the issue of identity. Specifically, appellant argues that "no one has identified the defendant nor did they connect him to the person that had committed the robbery." We disagree. Although Rodriguez, Ruiz, and Ramos each testified that they could not identify the assailants because their faces were covered with bandannas, the State introduced DNA evidence from blood samples collected from the front of the residence and leading down the street; such evidence was consistent with appellant's DNA profile. Similarly, blood evidence collected from the Lincoln, a gun found in a nearby trash can, a black bandanna found in the yard, and a baseball cap found nearby matched appellant's DNA profile. Appellant's fingerprints were also found on the Lincoln's windshield. Rodriguez testified that when one of the assailants picked him up and held him in a head lock, he put his gun over his shoulder and shot. When Detective Abbott saw appellant less than two weeks after the incident, appellant's right arm was bandaged and in a sling. The

---

[3] Appellant was charged as a party. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 2003) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.").

[4] *See id.* §§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2010). We note that the application paragraph of the charge on aggravated assault included an additional element: "while in the course of committing theft . . . ." The addition of this element is the subject of appellant's fourth issue, which we address separately. As noted, we review the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.– Corpus Christi 2004, pet. ref'd).

only controverting evidence that appellant points to is: (1) no witness identified him; and (2) Rodriguez's credibility was "suspect at best" because drugs and large amounts of cash were in the house.

Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of aggravated assault beyond a reasonable doubt. We overrule appellant's first issue.

### III. ADMISSION OF PHOTO

By his second issue, appellant contends the trial court erred in admitting "State's Exhibit 7", described as a photograph taken at the crime scene of the deceased person's hand wearing a latex glove. Appellant contends that the photograph was not material to any issue, was "gruesome" and "highly inflammatory," and that its prejudicial nature outweighed its probative value. *See* TEX. R. EVID. 403.

#### A. Standard of Review

The admissibility of photographs is within the sound discretion of the trial judge. *Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. *Young*, 283 S.W.3d at 854.

In determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, we consider several factors, including, but not limited to: (1) the number of exhibits offered; (2) their gruesomeness, size, and detail; (3) whether they are black and white or color; (4) whether they are close-up; (5) whether the body is naked or clothed; and (6) the availability of other means of proof

7

and the circumstances unique to each case. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).

**B.    Discussion**

Appellant challenges the admission of "State's Exhibit 7." State's Exhibit 7, however, was not admitted. State's Exhibit 2 was admitted and includes a photograph of the deceased person's hand. Appellant's counsel objected to two of the photographs in State's Exhibit 2 showing the decedent on grounds that they were not relevant and that any probative value was outweighed by their prejudicial effect. The following discussion occurred before the court prior to jury selection:

[Defense counsel]: And my argument would simply be it's not relevant, first of all. If the Court does deem it relevant, it's the probative value is exceeded by the prejudicial effect, and it will also cause jury confusion as to who's on trial here today and what this is about.

[Prosecutor]: Well, it helps account for the other two individuals and they just—it excludes anybody else from the three, except for Mr. Garcia, that we can account for the other two and where they are.

[Court]: Okay. I'm going to sustain his objection.

[Defense counsel]: As to all the photos, or—

[Court]: Well, you didn't have an objection as to the trash can or the other one.

[Defense counsel]: No.

[Court]: Just to the ones of the decedent?

[Defense counsel]: Right.

[Court]: So however you want to do that.

[Prosecutor]: We'll cut it out.

8

[Defense counsel]:	Okay.

[Court]:	Okay.

[Defense counsel]:	And then this proposed State's Exhibit Number 7, along those—let's see. Okay. First of all—

[Prosecutor]:	Hang on.

[Defense counsel]:	Go ahead.

[Prosecutor]:	As to the decedent, you said—

[Court]:	That one and the hand.

[Prosecutor]:	Well, the hand I want to offer it because it shows that the individuals were all wearing latex gloves which shows—it's proof to show that they're doing a robbery and they're not trying to leave any fingerprints.

[Court]:	Is that what that is?

[Prosecutor]:	Yes. And the latex gloves—or the purpose we're saying is so they won't leave any fingerprints behind at the crime scene.

[Defense counsel]:	I don't think there's been any evidence that's going to be presented by eyewitnesses that my client had latex gloves on. I don't know that that's going to be—

[Prosecutor]:	I don't remember, but we have the actual man that was—said he struggled with him, or who he saw out there. But people that normally wear latex gloves at a crime scene is to keep from leaving any fingerprints behind. And that would be consistent with these individuals doing a robbery or some kind of crime there.

[Court]:	Okay. I'll allow the hand, but not the body.

[Prosecutor]:	Yeah. I'll cut it out.

[Defense counsel]:	And then we have State's proposed Exhibit Number 7. The—this is another—there are nine photos on this one 8 by 11 sheet of paper. The middle—on the left-hand column, the middle photo would—this is—for

9

the same reason I'm objecting to this too. It's the hand of the decedent with a latex glove and it's tore [sic] up. I'm also going to object to this as unnecessarily gruesome.

[Prosecutor]: I just need one photo with the hand with the latex glove, Your Honor.

The State withdrew its request to admit State's Exhibit 7 because "[w]e've got the other one." It is clear that appellant's counsel objected to the admission of the photograph of the deceased person's hand. Accordingly, out of an abundance of caution, we will address appellant's complaint as it relates to the photograph in State's Exhibit 2.

State's Exhibit 2, showing the deceased person's hand wearing a latex glove, was re-introduced during the testimony of Detective Abbott. He testified that latex gloves were recovered from the body of the decedent and that latex gloves prevent a person from leaving fingerprints. The photograph at issue is a three-and-a-half by five-inch color photograph showing the deceased person's hand wearing a lacerated latex glove, palm up, and approximately six inches of the decedent's forearm, covered by what appears to be a long-sleeved sweatshirt. The sleeve is slightly pushed up, revealing a partial tattoo. There is some blood on the end of the sleeve. The photograph has probative value because, as the prosecutor argued, it establishes that the assailants took precautions to avoid leaving fingerprints.[5] No other photographs of the deceased person were admitted. The trial court admitted the photograph of the deceased person's hand, but did not admit a photograph of the body. We conclude that the photograph is relevant and that its probative value is not substantially outweighed by its possible prejudicial effect. *See* TEX. R. EVID. 403. Thus, we conclude that the trial

---

[5] The photograph thus has probative value as to appellant's liability as a party to robbery. *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

10

court did not abuse its discretion in admitting the photograph of the deceased person's hand in State's Exhibit 2.  We overrule appellant's second issue.

## IV.  JUROR BIAS

By his third issue, appellant contends the trial court erred in denying his motion for mistrial based on alleged juror bias.  Appellant contends that one of the jurors stated that she was "extremely angry" and felt "like a prisoner" because the trial court called a recess on the second day of trial and the trial did not continue until five days later.  Appellant argues that the juror's anger and hostility affected her deliberations in the case and prevented him from receiving a fair trial.

### A.  Standard of Review

We review a trial court's ruling on a motion for a mistrial using an abuse of discretion standard, viewing the record in the light most favorable to the trial court's ruling and upholding that ruling if it was within the zone of reasonable disagreement.  *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  A trial court abuses its discretion in denying a motion for a mistrial only when no reasonable view of the record could support the court's ruling.  *Id.*

The decision to remove or retain a juror lies within the discretion of the trial court.  *Uranga v. State*, 330 S.W.3d 301, 307 (Tex. Crim. App. 2010);  *Bjorgaard v. State*, 220 S.W.3d 555, 560 (Tex. App.–Amarillo 2007, pet. dism'd) (citing *Anderson v. State*, 633 S.W.2d 851, 853-54 (Tex. Crim. App. 1982)).  When reviewing a trial court's decision regarding potential jury misconduct, an appellate court should defer to the trial court's resolution of the historical facts and its determinations concerning credibility and demeanor.  *See Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997); *see also*

11

*Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009) (holding that because a juror testified that he could remain impartial despite overhearing a conversation about the case he was serving on, the trial court did not abuse its discretion in denying a mistrial). A juror is biased when an inclination toward one side of an issue rather than to the other leads to the natural inference that the juror will not or did not act with impartiality. *Anderson*, 633 S.W.2d at 853.

## B.  Discussion

On the second day of trial, the trial court told the jury that it was necessary to recess the trial because of a "medical situation."[6]  One of the jurors, N. K., told the court that because of her work schedule and obligations, she would suffer a hardship if she was required to return the following week.

When the trial resumed five days later, appellant's counsel advised the court that Juror N. K. "appear[ed] to be very angry" and was "glaring" at counsel and the court. Outside the presence of the other jurors, the trial court questioned Juror N. K. about her ability to be fair.  Juror N. K. responded:

| [Juror N. K.]: | I will be fair, but I'm extremely angry.  I feel like a prisoner.  I feel like my rights have been taken away. And I think what you guys have done to all of us jurors, to hold us over for a week is totally unconscionable.  And I'll be very honest with you, I don't appreciate it.  I—I think I—it's just a total lack of respect for all 12 of us. |
|---|---|
| [Court]: | Okay.   Now,  we  appreciate  your  concern.   I appreciate if you keep those concerns to yourself, if you have not already expressed it to them. |
| [Juror N. K.]: | I'm not the only one that feels that way, ma'am. |

---

[6] When trial resumed five days later, appellant's counsel advised, outside the presence of the jury, that appellant had suffered a mild heart attack, but was "okay."

12

[Court]:                    Okay.

[Juror N. K.]:          We've all really—we've all expressed our opinions to ourselves.

When the other jurors returned to the courtroom, the trial judge noted that the "issue" of being required to return for service had come to her attention, and it was necessary to inquire as to whether the jurors could be "fair to both sides." The trial court explained that the delay was "beyond anybody's control" and polled the jurors individually as to whether each could be fair. Each juror responded affirmatively. After the jurors were again excused, appellant's counsel argued that appellant would not receive a fair trial and requested a mistrial. The trial court denied the request for a mistrial.

In *Uranga*, the court of criminal appeals held that the trial court did not abuse its discretion in denying a motion for mistrial on alleged juror bias. *Uranga*, 330 S.W.3d at 307. In *Uranga*, a juror learned during the punishment phase that the defendant had damaged the juror's property in an extraneous offense. *Id.* at 302-03. The trial court held a hearing during the trial, questioned the juror regarding any actual bias, instructed the juror to not allow the incident to influence his decision, and accepted the juror's promise that he would not use the incident against the defendant in deciding the sentence. *Id.* The court of criminal appeals held that the trial court did not abuse its discretion in refusing to grant a mistrial. *Id.* at 307.

Similarly, in the present case, the trial judge held a hearing during the trial, questioned Juror N. K., questioned the jurors individually, and obtained assurances that each juror could be fair. We conclude that the trial court did not abuse its discretion in denying the motion for mistrial. We overrule appellant's third issue.

13

## V. CHARGE ERROR[7]

By his fourth issue, appellant complains that "[t]he trial court purported to submit to the jury a lesser-included offense of aggravated assault but actually submitted to the jury the charge of aggravated robbery twice; one section was merely labeled aggravated assault." The State concedes that the application paragraph of the charge on the lesser-included offense of aggravated assault incorrectly repeated the elements of aggravated robbery, the greater offense. The State argues, however, that the erroneous instruction did not harm appellant because it increased the State's burden to prove the additional element that the assault occurred "while in the course of committing theft of property and with the intent to obtain and maintain control over the property."

### A. Standard of Review

"A claim of jury-charge error is reviewed using the procedure set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)." *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). "The first step is to determine whether there is error in the charge." *Id.* "If there was error and appellant objected to the error at trial, reversal is required if the error 'is calculated to injure the rights of the defendant,' which we have defined to mean that there is 'some harm.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171). "If the error was not objected to, it must be 'fundamental' and requires reversal . . . only if it was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

### B. Discussion

---

[7] After appellant's attorney filed a brief in this case, appellant filed a pro se brief addressing his fourth issue. It is well-settled that an appellant has no right to hybrid representation in Texas. *Ex parte Taylor*, 36 S.W.3d 883, 887 (Tex. Crim. App. 2001). Accordingly, we consider only the issues raised in appellant's counsel's brief and do not address arguments raised in appellant's pro se brief.

It is undisputed that the application paragraph for aggravated assault contained an additional element and that appellant did not object to the charge on that basis. We need not decide, however, whether the charge was erroneous because even if we were to presume error, appellant cannot prevail because he cannot show he was harmed by the inclusion of the additional element in the application paragraph. Appellant makes no argument whatsoever regarding harm. He simply asserts that he "should be acquitted" because both application paragraphs contained the same language. Moreover, appellant was not harmed by an instruction that required the State to prove an additional element. *See Caballero v. State*, 927 S.W.2d 128, 131 (Tex. App.–El Paso 1996, pet. ref'd) (holding defendant was not harmed by an element of proof that was additional to that actually necessary to convict). We overrule appellant's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
14th day of April, 2011.

15