

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

06-19-00179-CR
_____

TIMOTHY BYNUM TAYLOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 46101-B

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

After a jury found Timothy Bynum Taylor guilty of one count of aggravated sexual assault of a child and one count of indecency with a child by contact, the trial court sentenced him to twenty years' confinement in prison on each count.[1] Taylor appeals, maintaining that (1) the evidence was legally insufficient to support the jury's guilty verdict, (2) the trial court erred when it admitted the victim's pretrial identification of Taylor in a photographic lineup, (3) the trial court erred when it admitted into evidence an irrelevant photograph, (4) the trial court erred when it denied Taylor's motion for new trial based on the State's repeated discovery violations, and (5) the trial court erred when it denied Taylor's motion for new trial based on juror misconduct. For the reasons below, we affirm the trial court's judgment.

## I.      Background

The State's amended indictment against Taylor alleged (1) one count of aggravated sexual assault of a child by penetrating C.E.'s[2] sexual organ with his sexual organ, (2) one count of indecency with a child by contact when Taylor contacted C.E.'s genitals with his mouth, and (3) a second count of indecency with a child by contact for causing his genitals to contact C.E.'s mouth. The State alleged that all three offenses occurred on May 24, 2015. The jury found Taylor guilty of the first two counts, and the trial court entered a directed verdict in favor of Taylor as to the

---

[1]The State's original indictment against Taylor alleged one count of aggravated sexual assault of a child (Count I), one count of indecency with a child by contact (Count II), and one count of indecency with a child by exposure (Count III). Later, the State amended Count III to allege indecency with a child by contact.

[2]We refer to the minor by initials in order to protect her privacy. *See* TEX. R. APP. P. 9.10.

third count.  The trial court sentenced Taylor to twenty years' confinement on each count, and ordered his sentences to run concurrently.  Taylor appeals.

## II.     The Testimony

### A.      C.E.

C.E. testified that when she was thirteen years old, she met her assailant, whom she knew as "Timothy," on a social media site called "Kik."  C.E. said she first communicated with "Timothy" online and that they eventually agreed to meet in person at a doughnut shop closer to her home.  C.E. described Taylor as "white with blond hair."  He picked her up in a truck and then took her to a camper trailer parked next to what she recalled as either his grandmother's or grandfather's house where they eventually had sexual intercourse.  C.E. stated that Taylor asked her how old she was and that she told him,  "13, 14, whichever -- I forgot which one."  According to C.E., Taylor told her that he was twenty-six years old.  C.E. did not tell anyone what had occurred when she returned home because she was scared of what would happen to her if she did.

At trial, C.E. was asked to identify her assailant in the courtroom, and the following exchange with the State occurred:

> Q.      . . . . . Okay. [C.E.], I showed you a photo earlier.  My question for you now is, if you saw this man - - or do you see the man who was there with you that day in the courtroom here today?
> A.       I -- I believe so.
> Q.       You believe so.  Will you please identify that person by something they are wearing?
>        Let me ask it, are they sitting on this side of me or on this side of me (indicating)?
> A.       On this side (indicating).
> Q.       And when you say "this side," are you pointing to your left, my right?
> A.       My left.

3

Q. Your left. Okay. Is it this lovely lady sitting next to me?
A. On, no -- no, ma'am.
Q. No, I'm -- I'm just going to go around the room. Is it this lady sitting next to you?
A. No, ma'am.
Q. Is it this man up here (indicating)?
A. No, ma'am.
Q. Is it this man over here in the uniform?
A. I -- no, ma'am.
Q. You can't see him? Okay.
Is it his man sitting at the far end of the table?
A. No, ma'am.
Q. Is it someone back there (indicating)?
A. Yes, ma'am.

This testimony constitutes the entirety of C.E.'s in-court identification testimony.

C.E. testified that she told her school counselor what had happened with Taylor. C.E. stated that she had been feeling sad and that she "couldn't keep it to [herself]." She explained that after she spoke to her counselor about what had taken place, she felt better. C.E. stated that her counselor contacted her mother, and then the investigation began.

**B.     Amanda Jameson**

Amanda Jameson testified she was C.E.'s school counselor in 2015, at the Longview, Texas, junior high school that C.E. attended and that C.E. told her about her experience with an individual she met on Kik. After receiving this information Jameson told another school counselor, the school's resource officer, and C.E.'s mother. Jameson said that C.E. showed her a text message from the individual C.E. had met online. Jameson stated that the conversation took place in 2015 and that C.E. was thirteen or fourteen years of age at that time. Jameson reported the incident to Child Protective Services (CPS) on May 25.

4

### C.    Kimberly Procell

Kimberly Procell is a forensic interviewer and the program director at the Martin House Children's Advocacy Center in Longview who interviewed C.E. approximately two weeks after the alleged offense occurred. Procell testified about the information C.E. told her in relation to the incident.

### D.    Nanette Parras

Nanette Parras testified that she is an emergency room sexual assault nurse examiner at Christus Good Shepherd Hospital and that she conducted C.E.'s sexual assault examination on the same day that C.E. participated in the forensic interview. C.E. told Parras that she met Taylor on social media and that she met him in person on one occasion. Parras testified that a vaginal examination revealed that C.E. had "[a] tear to the hymen at about 7:00 o'clock" and explained that such a tear would be associated with trauma. However, Parras also conceded that the tear could have resulted from C.E. having consensual sex with her boyfriend.

### E.    Audrey Wright

Based on the information contained in C.E.'s forensic interview, Audrey Wright, a sergeant with the Longview Police Department, began tracking an online moniker of Greyfox via Kik, using the undercover online persona of a thirteen-year-old girl. After making contact with Greyfox on Kik, Wright told him that she was thirteen years old to establish that she was underage. Wright said that Greyfox eventually told her that the other times he had talked to an underage person "it ended very badly."

Wright testified that she also searched the internet using Google to find more profiles and websites that were associated with the Greyfox moniker. Wright said that Greyfox described himself on some of the sites using basic information, such as age, height, and race, including recent information indicating that Greyfox was twenty-seven years old. When Wright later searched for the Greyfox moniker on March 3, 2016, the moniker had changed to Taylorlife89. Wright then logged onto Facebook, entered "Tim Taylor," and found a local resident with that name. She then took that information to dispatch and located his driver's license.

### F. Ferris Ellis

Ferris Ellis, a sergeant and investigator for the White Oak Police Department (WOPD), testified that Detective Wright contacted him about a case involving the sexual assault of a child. Ellis found the location where the alleged crime had occurred, described the property as "a single-family residence," and stated, "Behind that was a -- where I located a small camper, is behind it." Ellis determined that Taylor's grandfather, Douglas Green, owned the property. Green informed Ellis that Taylor had lived on the property until November 2016. Ellis said that Green was cooperative, that he allowed Ellis to search the camper on the property, and that the bed sheets found in the camper were "what [he] would call teal" and were substantially similar to the sheets C.E. had described to him.

On June 20, 2016, Ellis contacted Taylor at his residence in Gladewater. Taylor stated that he once had a Kik account but that he had not been on the site in over a year. Taylor agreed to meet Ellis the following day, but he did not make the meeting. Ellis made another attempt to meet Taylor, but that was also unsuccessful. At trial, Ellis testified that Taylor's appearance had

6

changed between the time of the investigation and the time of trial. According to Ellis, Taylor had gained weight and his hair had been "cut real short and got it slicked back today." He also said that Taylor had shaved his facial hair.

### H.  Douglas Green

Green testified that he is Taylor's grandfather and that Taylor had previously lived with him. Green explained that, in the past, there had been two camper trailers on his property, one belonging to Green's daughter, Beth Green (Beth), and the other belonging to Taylor's mother, Mariola Taylor. Green testified that a photograph marked as State's Exhibit 19 depicted the camper trailer that Beth owned and parked on his property. He also testified that neither Mariola nor Taylor lived in the camper trailer depicted in Exhibit 19. Green testified that Taylor moved away from his property about six years before the trial commenced. Despite the fact that Taylor was his grandson and had lived with him recently, Green could not identify Taylor in the courtroom.

### I.  Patricia Ann Pondoff

Patricia Ann Pondoff, who lived near Green's house at the time Taylor and his mother were living on Green's property, testified on behalf of Taylor. According to Pondoff, Taylor did not drive a pickup truck but, instead, "drove a little black car at the time." Pondoff admitted that Green drove a pickup truck, but she also testified that Green would not allow Taylor to borrow it. According to Pondoff, Taylor's hair color had not changed since the time of the incident, but she admitted that "he may have put on a few pounds, ten pounds maybe." Pondoff also stated that in 2015, Taylor had a goatee.

7

After hearing the evidence, the jury found Taylor guilty of aggravated sexual assault of a child (Count I) and indecency with a child by contact (Count II). He was sentenced to twenty years' confinement on each count, with his sentences to run concurrently.

## III. Discussion

### A. Admission of Evidence

In his second and third points of error, Taylor contends that the trial court erred when it admitted (1) C.E.'s pretrial identification of Taylor in a photographic lineup and (2) a photograph of a trailer, which Taylor contends "had no connection to the alleged assault."

#### 1. Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

### 2.     C.E.'s Pretrial Identification of Taylor

### a.     Background Facts

Taylor contends that "the trial court erred by admitting evidence of a tainted pretrial photographic lineup that resulted in a less-than-conclusive identification."  Specifically, Taylor contends that Ellis did not substantially comply with Article 38.20 of the Texas Code of Criminal Procedure[3] because "Ellis, as lead investigator, knew which of the photographs was Taylor's; yet he administered the photographic lineup to C.E., who was only 14 years old at the time."[4] According to Taylor, by administering the photographic lineup himself, Ellis failed to administer the lineup in a blind manner.  He concludes that this failure to comply with Article 38.20 rendered the photographic lineup impermissibly suggestive and violated his due process rights.  We disagree.

A trial, Taylor objected to the introduction of the photographic lineup, and the trial court conducted a hearing outside the jury's presence.  Ellis testified that he showed C.E. a group of photographs and that he had followed WOPD's policy for conducting photographic lineups in doing so.  Ellis also read the instructions he gives to a witness prior to a photographic lineup.  Ellis explained that he would specifically tell the witness that the person who committed the offense

---

[3]Article 38.20, Section 3(a), of the Texas Code of Criminal Procedure states, "Each law enforcement agency shall adopt, implement, and as necessary amend a detailed written policy regarding the administration of photograph and live lineup identification procedures in accordance with this article."  TEX. CODE CRIM. PROC. ANN. art. 38.20, § 3(a) (Supp.).  In relation to photographic lineups in particular, an agency must have "procedures for assigning an administrator who is capable of administering a photograph array in a blind manner or in a manner consistent with other proven or supported best practices designed to prevent opportunities to influence a witness."  TEX. CODE CRIM. PROC. ANN. art. 38.20, § 3(2)(F) (Supp.).

[4]To the extent Taylor complains that there was no recording made of the lineup, we find no such requirement contained in Article 38.20.  Likewise, recording the event, or Ellis's failure to do so, has no direct nexus to whether Ellis's actions actually contributed to C.E.'s identification of Taylor.

9

might not be included in the lineup. Ellis said that he followed the appropriate steps during the photographic lineup. He also testified that he did not "in any way suggest which photo she should pick out." Finally, he testified that C.E. indicated that she was ninety percent certain that Taylor was the assailant.

Ellis admitted that he had "a full week" to find another officer to administer the photographic lineup, but did not do so. Ellis explained, "If we'd had one available on duty, I might have possibly been able to get one. But I couldn't tell you who was on duty at the time. I couldn't tell you." Ellis said that he did not recall attempting to find another officer, but that he believed he had not. Ellis also testified that it was "not [his] normal procedure" to record photographic lineups. Ellis stated that he "personally" believed that his actions were in line with "the best practices of ensuring objectivity." Ellis stated that he used a lineup certification form, which he then placed in the file in order to document the lineup. The trial court overruled Taylor's objection and admitted the photographic lineup and Ellis' testimony.

### b. Applicable Law

"The due process clause of the Fourteenth Amendment prohibits the use of identification testimony from a witness who was subjected to an impermissibly suggestive pretrial identification procedure." *Roberts v. State*, 923 S.W.2d 141, 144 (Tex. App.—Texarkana 1996, pet. ref'd). "The reason for the rule is the substantial likelihood of misidentification that suggestive procedures may engender." *Id.* (citing *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988). However, if the totality of the circumstances reveals no substantial likelihood of misidentification, even though the procedure was impermissibly suggestive, the court will consider the identification testimony

10

reliable. Reliability is the linchpin in determining the identification testimony's admissibility. *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988); *Roberts*, 923 S.W.2d at 144.

### c. Analysis

Even assuming, without deciding, that Ellis's failure to administer a blind photo array was suggestive,[5] we do not find a substantial likelihood that C.E. misidentified Taylor under the totality of the circumstances. In evaluating the likelihood of misidentification caused by the corrupting effect of any suggestive identification procedure, we may consider (1) the witness's opportunity to view the assailant at the time of the crime, (2) how much attention the witness was paying to the assailant, (3) the accuracy of the witness's description of the assailant, (4) the level of certainty the witness demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Webb*, 760 S.W.2d at 269.

Here, although C.E. did not participate in the photographic lineup until well after the assaults occurred, she expressed a very high degree of certainty in her identification of Taylor's photograph. Importantly, C.E. had a significant amount of time to observe Taylor prior to the assault because she had spent time with him in his truck when traveling to Green's house. And because this occurred before the assault, C.E.'s opportunity to observe Taylor was not tainted by the fear and confusion attenuating the assault itself. Certainly, C.E.'s ability to observe her assailant before the incident occurred gave her ample opportunity to help her recall Taylor's

---

[5]The State points to various cases, holding that a non-blind administration of an identification procedure does not necessarily justify suppression of the evidence when there is no showing that the officer said or acted in a manner that would have encouraged the witness to pick a particular photograph. *See Niess v. State*, Nos. 03-11-00213-CR, 03-11-00214-CR, 03-11-00215-CR, 03-11-00216-CR and 03-11-00217-CR, 2012 WL 2383300, at *1 (Tex. App.—Austin June 21, 2012, no pet.) (mem. op., not designated for publication).

physical appearance, and she was in particularly close proximity to Taylor for a significant period of time.

In addition, although he knew it was not true, Ellis told C.E. that he did not know whether the suspect's photograph was in the photo lineup. He testified that he showed the photographs to her one at a time and that he told her she could take as much time as she needed to look at them. He further testified that he assured C.E. that she was not required to make a selection. Further, Ellis testified that he gave no hint or indication regarding Taylor's appearance, other than reminding her that hair styles, beards, and mustaches could easily be changed and that the colors in the photographs might appear different than what they really were. Taylor did not present any evidence contradicting that testimony.

In sum, even if we assume that Ellis did not conduct a blind photographic lineup, there is no evidence that his failure to do so contributed to C.E. choosing Taylor's photograph. Thus, even if Ellis's failure to conduct a blind photographic lineup had been impermissibly suggestive—which we do not decide—we find that the totality of the circumstances does not reveal a substantial likelihood that C.E. misidentified Taylor. *See Roberts*, 923 S.W.2d at 144.

We overrule Taylor's second point of error.

### 3. Photograph of the Trailer

In his third point of error, Taylor contends that the trial court erred when it admitted State's Exhibit 19 because it was an irrelevant photograph "of a travel trailer that had no connection to the alleged assault." We disagree.

Rule 402 of the Texas Rules of Evidence provides that all relevant evidence is admissible. TEX. R. EVID. 402. Rule 401 defines relevance as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Evidence identifying the scene where the alleged assaults occurred was relevant. While it is true Ellis testified that he did not believe that the assault took place in the camper trailer shown in Exhibit 19 because C.E. described the trailer as containing a television and he did not see one, he also testified that he located teal sheets in the trailer, which corroborated C.E.'s statement that she thought the assaults took place on blue sheets. As the fact-finder, the jury was allowed to consider all, part, or none of a witness's testimony. *Elkins v. State*, 822 S.W.2d 780, 783 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). "Moreover, the law does not require that all of the State's witnesses testify consistently, or even that all the State's evidence support the State's theory of the case." *Id.*

Accordingly, Taylor's objections to State's Exhibit 19 go to the weight to be given that evidence rather than to its admissibility. The jurors, as the fact-finders, were well within their discretion to give as much weight as they wanted to Ellis's testimony regarding the camper trailer and were free to find that the trailer, which may not have contained a television but did contain similar color sheets as those described by C.E., was the scene of the crime. Consequently, we find that the trial court did not err when it admitted the complained-of exhibit.

We overrule Taylor's third point of error.

### B. Sufficiency of the Evidence

#### 1. Standard of Review

In his first point of error, Taylor contends that the evidence was legally insufficient to support the jury's guilty verdicts. "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous legal sufficiency review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))). Circumstantial evidence is as probative as direct evidence, and it can be sufficient alone in establishing guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

### 2. Analysis

Taylor maintains that C.E. failed to identify Taylor during trial and that, because the only other evidence to support the guilty verdicts was "a tainted pretrial identification and a nebulous link forged by law enforcement between Taylor and the perpetrator's online moniker[,]" the evidence was insufficient to support the jury's verdict. We disagree.

While we agree with Taylor that "an uncertain in-court identification of an accused as the perpetrator of a crime, standing alone, is insufficient to support a guilty verdict," *Anderson v. State*, 813 S.W.2d 177, 179 (Tex. App.—Dallas 1991, no pet.), "the identity of a perpetrator of an offense can be proved by direct or circumstantial evidence." *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (citing *Oliver v. State*, 613 S.W.2d 270, 274 (Tex. Crim. App. [Panel Op.] 1981 (op. on reh'g)). Thus, even if the identification is equivocal, or if no witness positively identifies the defendant as the perpetrator of the offense, corroborating direct or circumstantial evidence will support a guilty verdict. *See id.*; *Hernandez v. State*, 13 S.W.3d 78, 80–81 (Tex. App.—Texarkana 2000, no pet.); *Anderson*, 813 S.W.2d at 179.

Accordingly, even if we were to assume that C.E. was unable to identify Taylor as the perpetrator of the assaults at trial, there was sufficient evidence to support a finding that he was, in fact, the perpetrator.[6] First, in evaluating the strength of C.E.'s in-court identification, the jury could have considered Ellis's testimony that Taylor's physical appearance in the courtroom was significantly different than it had been at the time of the assaults. Likewise, the jury was free to reject Pondoff's testimony that Taylor's appearance had changed only minimally and Green's inability to identify Taylor. As the fact-finder, the jury was entitled to consider all of this, weigh the witnesses' testimony and credibility, and resolve the issue in favor of Ellis' version.

In addition, C.E. testified that her assailant was named Timothy and that she met him on the Kik app. Parras testified that C.E. had identified her assailant as an individual named Tim and that she first became acquainted with him through social media. C.E. also said that her assailant told her that he was twenty-six years old at the time of the incident. The jury also heard that Taylor was born in February 1989, which means he would have been approximately twenty-six years old at the time of the assaults.

Also, according to C.E., Taylor took her to a camper trailer parked on his grandfather's property. Likewise, she stated that the assaults took place on a bed that had what she believed to be blue sheets, and during his investigation, Ellis located what he described as teal sheets in a camper trailer parked on Green's property. Thus, the evidence at trial supported C.E.'s description of the property.

---

[6]We note that in a legal sufficiency review, we are called upon to "review all the evidence in the light most favorable to the trial court's judgment," not contrary to the trial court's judgment. *Williams*, 589 S.W.3d at 297. Accordingly, we do not make this assumption; rather, we merely point out that Taylor's argument fails because the remaining evidence is legally sufficient by itself to support the verdict in this case.

Further, Ellis learned from Wright that the suspect's name was Timothy Taylor. Wright also gave Ellis an address where Taylor might have resided at the time of the assaults. Ellis went to that address and found a house and a camper trailer, just as C.E. had described. While there, he spoke with Taylor's grandfather, Green, who owned the property. This corroborated C.E.'s statement that Taylor had assaulted her in a trailer on his grandfather's property. Ellis also testified that Green told him that Taylor had lived on Green's property until November of 2016, well after the date of the alleged assault.

In addition, the jury heard Wright's testimony about her searches for an online moniker that included "Greyfox," which, according to Wright and C.E, was the name used by the person with whom C.E. had communicated online via the Kik app. Wright testified that she successfully contacted "Greyfox" on the Kik app and told him she was thirteen years old, but that he refused to communicate with her because his previous encounter with a juvenile had "ended badly." Wright then continued her search for Greyfox on Google and found sites and photographs that were associated with the Greyfox moniker. Wright learned that Greyfox claimed that he was twenty-seven years old. When she subsequently entered a search on Google for Greyfox, on March 3, 2016, she discovered that the Greyfox moniker had been changed to Taylorlife89, which was consistent with Taylor's last name and year of birth.

As we have already found, there was no evidence that Ellis's actions resulted in C.E.'s misidentification of her assailant. Notably, C.E.'s identification of Taylor during the photographic lineup occurred closer in time to the assaults than her trial testimony, and the jury could reasonably

17

have concluded that C.E.'s photographic lineup identification was more persuasive than her inability to identify him in the courtroom four years later.

The fact-finder is afforded considerable discretion in making factual determinations. In this case, the jury was presented with several witnesses and many pieces of evidence supporting the jury's verdict in what could surely be considered a fact-intensive case. Accordingly, we find that based on the record in this case, a "rational jury could have found [that C.E. identified Taylor as her assailant] beyond a reasonable doubt." *Williamson*, 589 S.W.3d at 297.

We overrule Taylor's first point of error.

## C.     The Trial Court Did Not Err When It Denied Taylor's Motion for New Trial

Next, Taylor maintains that the trial court erred by denying his motion for new trial based on (1) the State's failure to disclose information pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and the Michael Morton Act and (2) jury misconduct.

We review a trial court's decision to deny a motion for new trial by determining whether there has been an abuse of discretion. *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010). We must review the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against the losing party. *Quinn v. State*, 958 S.W.2d 395, 402 (Tex. Crim. App. 1997). Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). We do not substitute our judgment for that of the trial court, but rather, we

18

determine only whether the trial court's decision was arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).

### 1. Discovery Violations

In his fourth point of error, Taylor contends "that the State committed numerous discovery violations over the course of [his] trial, which compounded to deny Taylor a fair trial in violation of the Due Process Clause of the United States Constitution." Specifically, he complains of the State's failure to timely tender several photographs of Green's property and its failure to disclose, until Taylor's trial counsel elicited it on cross-examination, additional computer images from Wright's online search for the "Greyfox" moniker. According to Taylor, the State's failure to provide him with the complained-of evidence was a violation of Article 39.14 of the Texas Code of Criminal Procedure,[7] a *Brady* violation,[8] and a violation of the Michael Morton Act.[9] Taylor

---

[7]Article 39.14 requires the State to produce evidence that is "material to any matter involved in the action and that [is] in possession, custody, or control of the state or any person under contract with the state." TEX. CODE CRIM. PROC. ANN. art. 39.14.

[8]The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated when a prosecutor fails to disclose evidence favorable to the accused that creates a probability sufficient to undermine confidence in the outcome of the trial. *Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992). In order to establish a due process violation under *Brady*, a defendant must show that (1) the evidence was suppressed, (2) the suppressed evidence was favorable to the defense, and (3) the suppressed evidence was material to either guilt or punishment. *See Brady*, 373 U.S. 83.

At trial, Taylor did not argue that the State's actions amounted to a *Brady* violation. Instead, he argued only that he was unfairly surprised by the untimely evidence. In his motion for new trial, Taylor did not argue that he was unfairly surprised and did not contend that the State's failure to tender the complained-of evidence was a *Brady* violation. Instead, maintaining the State had violated the Michael Morton Act, Taylor argued, "The State should have ensured that the police departments involved in the case had handed over all the evidence. The responsibility is on the State to turn over the evidence. The fact that these failures were discovered in the middle of trial and, on one occasion, during cross[-]examination, is egregious and effectively deprived the Defendant of his right to effective cross[-]examination as guaranteed by the Sixth Amendment."

[9]*See* Act of May 14, 2013, 83d Leg., R.S., ch. 49, § 2, 2013 Tex. Gen. Laws 106, 106 (eff. Jan. 1, 2014) (codified at TEX. CODE CRIM. PROC. art. 39.14).

19

asserts that (1) he was unfairly surprised regarding the photographs of Green's property and (2) had his trial counsel been aware of the computer images found by Wright during her investigation, she would have used a different trial strategy when cross-examining her.

Outside the presence of the jury, the State offered twenty-two photographs of Green's property and tendered them to Taylor for his review. According to the State, it had received the photographs from the WOPD just that morning. Taylor argued, "And I need to know when they were taken, how long the police have had them. Because it's absurd to be receiving evidence in the middle of trial. The—and understanding the DA has also just received these, this is still not okay."

The State then suggested that it question Ellis about the photographs, which the trial court allowed. During the questioning, Ellis explained that the photographs included, among others, a photograph of Green's house and the camper located at the back of his property. Ellis explained that he had taken the photographs and that they were true and accurate representations of what he had seen when he took them. Ellis also explained that he had no "mal-intent" when he failed to provide the photographs to the district attorney's office. According to Ellis, "[He] didn't realize that [the prosecutor] didn't have the[m]."

On cross-examination, Ellis testified that he did not get close enough to Green's house to take a photograph of the home address. He also stated that the photographs were taken a "full year" after the incident was alleged to have occurred and that the photographs were never shown to C.E. At that point, Taylor objected to the photographs' relevance. Taylor conceded that the State should be allowed to use the photographs to refresh Ellis's memory but that he would "object

20

to any attempts at admitting [them]." As relevant here, Taylor objected to their admission, stating that it was an "unfair surprise to defense counsel." Although Taylor did not ask for a continuance, the trial court gave Taylor the opportunity to review the exhibits during the lunch hour.

Taylor also complains of the State's failure to timely disclose two computer "screen grab" images that had been found during Wright's online search for the "Greyfox" moniker. Although Taylor objected to this evidence at trial, he did not request a continuance to review the computer images. Moreover, the day after Taylor objected, he informed the trial court, "Yesterday, we did put it on the record that there were two screenshot images that have not been turned over. To my understanding, I'm not sure if the State had either one of them either." He continued, "I know [as to] one of [the prosecutors], [the prosecutor] indicated that she did not have either, but I'm not sure about the other [prosecutor]. But, I do have those now and would be ready to proceed."

To the extent Taylor argues that he was unfairly surprised, we need not address the merits of his complaint because he failed to request a continuance on grounds of surprise. "Failure to seek a continuance or postponement of the trial when the State allegedly fails to fully effectuate discovery causing surprise waives any error." *McQueen v. State*, 984 S.W.2d 712, 718 (Tex. App.—Texarkana 1988, no pet.) (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. [Panel Op.] 1982); *Garner v. State*, 939 S.W.2d 802, 804 (Tex. App.—Fort Worth 1997, pet. ref'd); *Mock v. State*, 848 S.W.2d 215, 222 (Tex. App.—El Paso 1992, pet. ref'd)).

However, Taylor also maintains that the State's failure to provide the photographs and computer images violated Article 39.14 of the Texas Code of Criminal Procedure and the Michael Morton Act. "The Michael Morton act was designed to ensure that a defendant can discover, on

21

request, 'the evidence material to any matter involved in the action.'" *Love v. State*, 600 S.W.3d 460, 477 (Tex. App.—Fort Worth 2020, no pet.) (quoting TEX. CODE CRIM. PROC. ANN. art. 39.14 (Supp.)). Citing several unpublished cases, the State contends that "this requirement to seek a continuance before being entitled to any relief for the alleged late disclosure of material evidence has continued to apply in cases even after the Michael Morton Act went into effect." *See State v. Carranza*, No. 13-17-00059-CR, 2017 WL 5505754, at *2 (Tex. App.—Corpus Christi Nov. 16, 2017, no pet.) (mem. op., not designated for publication); *Byrd v. State*, No. 02-15-00288-CR, 2017 WL 817147, at *5 (Tex. App.—Fort Worth Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication); *Pfeiffer v. State*, No. 07-14-00277-CR, 2016 WL 3995742, at *3 (Tex. App.—Amarillo July 21, 2016, pet. ref'd) (mem. op., not designated for publication). Thus, the State argues that Taylor waived his objection as well.

Nevertheless, we need not address the issue of waiver as it relates to Taylor's objections under the Michael Morton Act. Even if the State's actions violated the Michael Morton Act and Article 39.14 of the Texas Code of Criminal Procedure—which we do not decide—the trial court did not err in overruling his objections unless the late-disclosed evidence was material. Courts addressing this issue have held that materiality means that "there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *See Watkins v. State*, 554 S.W.3d 819, 822 (Tex. App.—Waco 2018, pet. granted); *see also Carrera v. State*, 554 S.W.3d 800, 802 (Tex. App.—Waco 2018, no pet.) ("Evidence must be 'indispensable to the State's case' or must provide a reasonable probability that its production would result in a different outcome to be considered material and subject to mandatory disclosure under Article 39.14(a).").

22

On appeal, Taylor contends that he would have cross-examined the State's witness in a different manner had the complained-of evidence been disclosed in a timely manner. Yet, Taylor has not shown that the additional evidence was indispensable to the State's case or that there is a reasonable probability that the timely production of the evidence would have resulted in a different outcome. Accordingly, we do not find that the late-disclosed evidence in this matter was material and, therefore, do not find that the trial court erred in overruling Taylor's objections.

We overrule Taylor's fourth point of error.

### 2.      Jury Misconduct

Lastly, Taylor maintains that the trial court abused its discretion by denying his motion for mistrial based on evidence of jury misconduct. Taylor contends that (1) a juror relied on "other evidence" to arrive at a guilty verdict and (2) slept through critical portions of the trial. According to Taylor, one of the jurors reported to his counsel after the trial that she had relied on impermissible out-of-court evidence to support her guilty verdict. Specifically, Taylor contends,

> The juror reported that she had served as a camp counselor and in that capacity had seen many girls use self-inflicted cutting as a mode of coping with sexual abuse. The juror further reported that, because C.E. also exhibited cutting behaviors, she believed that C.E. had been sexually abused as well and on that basis voted to convict Taylor.

Rule 21.3(f) of the Texas Rules of Appellate Procedure mandates the granting of a new trial "when, after retiring to deliberate, the jury has received other evidence." *See* TEX. R. APP. P. 21.3(f). Whether jury misconduct occurs during a trial is a question of fact for resolution by the trial court. *Pharo v. Chamber Cty., Tex.*, 922 S.W.2d 945, 948 (Tex. 1996). To warrant the granting of a new trial based on juror misconduct or improper communication to the jury, an

23

appellant must demonstrate (1) that misconduct occurred, (2) that such misconduct was material, and (3) that such misconduct probably caused injury. TEX. R. CIV. P. 327(a); *see also Brandt v. Surber*, 194 S.W.3d 108, 133 (Tex. App.—Corpus Christi 2006, pet. denied). An outside influence "must emanate from outside the jury and its deliberations." *Soliz v. Saenz*, 779 S.W.2d 929, 931–32 (Tex. App.—Corpus Christi 1989, writ denied).

During the hearing on the motion for a new trial, Taylor stated, "At this time, Judge, I would like to let you know that I don't have any witnesses or evidence to present, and that my -- and that my motion is based on the law and what the Court has already seen." Counsel asked that the trial court take judicial notice of the entire record, which the trial court did. Nevertheless, motions and counsel's arguments are not considered evidence. *See State v. Guerrero*, 400 S.W.3d 576, 586 (Tex. Crim. App. 2013); *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 669 (Tex. App.—Dallas 2003, no pet.) (recognizing that motions and arguments of counsel are not evidence). Likewise, we find no affidavits in the record addressing this argument. Therefore, the trial court had no evidence upon which to grant Taylor's motion for a new trial based on a juror's alleged consideration of outside evidence.

Taylor also claims that the same juror was discovered sleeping throughout the trial. The transcript contains the following brief comment by the trial court: "All right. Ladies and gentlemen, if I can have all the jurors just stand up for a second." The court continued, "I know -- I -- we're almost ready for our lunch break, so if you can hang in there for a few more minutes. Again, if you start feeling tired, please stand up." Yet, neither Taylor nor the State objected to any specific behavior. Thus, this single reference to the transcript presents no evidence that any juror

actively slept during the trial. Moreover, during the hearing on the motion, Taylor did not submit any evidence in the form of an affidavit or live testimony to support his argument that a juror fell asleep and that, as a result, the juror's alleged misconduct probably caused him injury. *See Brandt*, 194 S.W.3d at 133.

We overrule Taylor's fifth point of error.

## III.     Conclusion

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice


Date Submitted:     April 21, 2020
Date Decided:       August 12, 2020

Do Not Publish